# UNITED STATES DSITRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION [Type here]

JERELL THOMAS
PLAINTIFF(S)

CASE No. 13 CH 3488

V.

**JUDGE: CHENG**

UNITED STATES POSTAL SERVICES
&
NATIONAL MAILHANDLERS UNION
DEFENDANT(S)

## <u>Amended Complaint Breach(s) of Contract / Fraudulent Concealment</u>

RULES OF CIVIL PROCEDURE FOR THE UNITED STATES DISTRICT COURTS
1 Effective September 16, 1938, as amended to December 1, 2013
TITLE I. SCOPE OF RULES; FORM OF ACTION
Rule 1. Scope and Purpose
These rules govern the procedure in all civil actions and proceedings in the United States district
courts, except as stated in
Rule 81. They should be construed and administered to secure the
just, speedy, and inexpensive determination of every action and
proceeding.
(As amended Dec. 29, 1948, eff. Oct. 20, 1949; Feb. 28, 1966, eff. July
1, 1966; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)
Rule 2. One Form of Action
There is one form of action—the civil action.
(As amended Apr. 30, 2007, eff. Dec. 1, 2007.)
TITLE II. COMMENCING AN ACTION; SERVICE OF PROCESS,
PLEADINGS, MOTIONS, AND ORDERS
Rule 3. Commencing an Action
A civil action is commenced by filing a complaint with the court.
(As amended Apr. 30, 2007, eff. Dec. 1, 2007.)
Rule 4. Summons

Rule 1837 Common LAW
Rule 1984 Common LAW



ALL-STATE LEGAL®
**EXHIBIT**
B

Code of civil procedures are as follows (735 ILCS 5 / 13- 214.0) (FROM ch. 110, par. 13-214.2) (Source: P.A. 85-655; 86-1329.) Breach of Contract (735 ILCS 5 / 13-215) ( FROM ch. 110, par. 13-215) (Source: P.A. 82-280.) Fraudulent Concealment. **REMEDIES: Exhibit 1:** Actual contract agreement by signed parties. **Exhibit 2:** Proof of payment by pay stub union due payments. **Exhibit 3:** Written statements to Management and Union Stewart Delegated to Palatine Mail Processing Center. **Exhibit 4:** Headquarters of national Mailhandlers Union phone records. **Exhibit 5:** Witness(s) to contract agreement. **Exhibit 6:** Internet Source 'Material' Breach of Contract and Definition for Breach of Contract. **Exhibit 7:** United States Department of labor Document(s) Rules and regulations in the workplace. **Exhibit 8:** Negligence 2.3.4.-1.5.-2.6.-3.7. **Exhibit 9:** Combined motion to amend complaint / add defendant **Exhibit 10:** National Postal mailhandlers Union contract Interpretation manuel **Exhibit 11:** 'Doctrine' FAIR REPRESENTATION AND BREACH OF CONTRACT IN SECTION 301 EMPLOYEE-UNION SUITS: WHO'S WATCHING THE BACK DOOR?

Exhibit 9

U.S. DISTRICT COURT

Not filed with Court

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RECEIVED JUN 2 3 2014

JERELL THOMAS

Plaintiff(s)

v.

United States Postal Service

Defendant(s)

Case No. 13CH3488

Judge: Cheng

## Combined Motion to Amend Complaint / Add defendant

Plaintiff JERELL Thomas respectfully request adding additional federal defendant of seperate entity named defendant National Mail Handlers Union of Contract with federal government. Apart from United States Postal Service in Federal employment discrimination claim 13CH3488. Plaintiff JERELL Thomas prayerfully wishes to add Breech of Contract to claim 13CH3488, Neglect of obligation to service(s) of Promised Contracted Union agreement. Neglect of Labor Management relations, Shareholder paid fees for Union representation, employee made written statement with all claimed acts in written/verbal form to apporiate Union official in timely fashion of discrimination, National Mail Handlers Union failed to Uphold Contracted agreement. Failed to represent employee or commit any actions on behalf of employee claims of employment discrimination, violating signed and agreed upon Contract obligations breech of Contract by National Mail Handlers Union.

JERELL THOMAS

Exhibit 11

# FAIR REPRESENTATION AND BREACH OF CONTRACT
## IN SECTION 301 EMPLOYEE-UNION SUITS:
### WHO'S WATCHING THE BACK DOOR?

Section 301 of the Labor Management Relations Act[1] has provided both unions[2] and employers[3] with a federal forum[4] for suits to enforce collective bargaining agreements. Initial furor as to whether the section merely provided federal jurisdiction for the application of state law, or instead was enacted to allow federal judges to apply federal common law, has gradually subsided, as the latter view has gained prevalence.[5]

In recent years it has also become settled that section 301 empowers an employee to bring suit against his employer for breach of contractually-created employee rights.[6] The courts have not, however, definitively resolved the question which is the subject of this Comment: whether section 301(a) also provides jurisdiction for an employee suit against a union for breach of contract. Of course, such a suit can arise under the section only in those comparatively rare situations in which a union breaches a covenant it made with an employer, by which it conferred third-party beneficiary rights upon employees. Such provisions arise relatively infrequently for the obvious reason that the norm in collective bargaining is for management to extract promises redounding directly to its own benefit, rather than to bargain altruistically on behalf of its employees. Within the fairly narrow

---

[1] Section 301(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties . . .

29 U.S.C. § 185(a) (1970).

[2] See, e.g., Retail Clerks Local 1222 v. Alfred M. Lewis, Inc., 327 F.2d 442 (9th Cir. 1964); United Steelworkers v. Copperweld Steel Co., 230 F. Supp. 383 (W.D. Pa. 1964).

[3] See, e.g., Electrical Contractors Ass'n v. Local 103, IEW, 458 F.2d 590 (1st Cir. 1972); Shirley-Herman Co. v. Hod Carriers Local 210, 182 F.2d 806 (2d Cir. 1950).

[4] State courts do retain concurrent jurisdiction to adjudicate § 301 claims. Amalga-

*Exhibit 10*

# ~~National~~ Postal Mail Handlers Union - Unity ·

# ~~Democracy~~ · Strength - Division of LIUNA - AFL-

# ~~CIO~~ (http://www.npmhu.org//) ,

# ~~National~~ Postal Mail Handlers Union A Division of ·

# ~~LIUNA~~ (AFL-CIO) (http://www.npmhu.org//).

SEARCH THE SITE... [ Submit Query ]

- Home (http://www.npmhu.org//)
- About NPMHU (http://www.npmhu.org//about)
  - Our Union (http://www.npmhu.org//about/union)
  - Local Unions (http://www.npmhu.org//about/local)
  - Executive Board (http://www.npmhu.org//about/board)
  - Contract Administration Department (http://www.npmhu.org//about/contract-administration-department)
- Media Center (http://www.npmhu.org//media)
  - News (http://www.npmhu.org//media/news)
  - Mail Handler Update (http://www.npmhu.org//media/update)
  - The Mail Handler (http://www.npmhu.org//media/magazine)
  - Photos (http://www.npmhu.org//media/photos)
  - Videos (http://www.npmhu.org//media/videos)
- Legislative & Political (http://www.npmhu.org//legislative)
  - Legislative Center (http://www.npmhu.org//legislative/center)
- Member Resources (http://www.npmhu.org//resources)
  - Member Benefits (http://www.npmhu.org//resources/member-benefits)
  - Wage Charts (http://www.npmhu.org//resources/wage-charts)
  - National Agreement (http://www.npmhu.org//resources/agreement)
  - Contract Interpretation Manual (http://www.npmhu.org//resources/contract-interpretation-manual)
  - MAILS and Shop Steward Resources (http://ws2.npmhu-research.org/)
  - National Union Constitution (http://www.npmhu.org//resources/national-constitution)
  - Uniform Local Union Constitution (http://www.npmhu.org//resources/local-constitution)
  - Merchandise (http://www.npmhu.org//resources/merchandise)
  - Buy Union. Buy American. (http://www.npmhu.org//resources/buy-union)
- Hot Topics (http://www.npmhu.org//topics)
  - 2012 National Convention (http://www.npmhu.org//topics/2012-national-convention)
  - Contract Updates (http://www.npmhu.org//topics/contract)
  - Critical Postal Issues (http://www.npmhu.org//topics/issues)

# Member Resources (http://www.npmhu.org//resources)

# Contract Interpretation Manual



## CONTRACT INTERPRETATION MANUAL (CIM) Version 3

As provided for in Article 15, Section .3E of the National Agreement between the National Postal Mail Handlers Union and the United States Postal Service, both parties have agreed to jointly produce a Contract Interpretation Manual (CIM), which represents a good faith effort to identify contractual issues on which the National parties are in agreement regarding interpretation and application of the parties' National Agreement. The latest issue of the CIM is Version 3, which was released in March 2011.

(Click to download and open CIM Version 3) (http://www.npmhu.org//resources/document/C.I.M.-Contract-Interpretation-Manual_Version-3-March-2011.pdf)

Share (http://addthis.com/bookmark.php?v=250&username=atucomm) RSS (http://www.npmhu.org//feed)

## In Member Resources (http://www.npmhu.org//resources)

- Member Benefits (http://www.npmhu.org//resources/member-benefits)
- Wage Charts (http://www.npmhu.org//resources/wage-charts)
- National Agreement (http://www.npmhu.org//resources/agreement)
- Contract Interpretation Manual (http://www.npmhu.org//resources/contract-interpretation-manual)
- MAILS and Shop Steward Resources (http://ws2.npmhu-research.org/)

# Member Resources (http://www.npmhu.org//resources)

# National Union Constitution



**CONSTITUTION**

of the National Postal
Mail Handlers Union

A DIVISION OF THE LABORERS'
INTERNATIONAL UNION
OF NORTH AMERICA,
AFL-CIO

**Click to read**

Additions or revisions made by the delegates attending the
NPMHU's 2012 National Convention are set forth in bold print

**PREAMBLE**

We, the National Postal Mail Handlers Union, establish this Constitution in order to form a more perfect union.

We believe that all working people and all human beings have a right to a safe and decent living at a reasonable wage and that all members of society are entitled to equal and fair justice.

We believe that all people, regardless of race, color, sex, sexual orientation, age, national origin, physical or mental handicap, or creed are entitled to equal opportunity and treatment.

We further believe that all members of society should challenge such pernicious evils as racism,

---

**Constitution of the National Postal Mail Handlers Union**

As Amended By The National Convention
August 6 - 11, 2012

**PREAMBLE**

*We, the National Postal Mail Handlers Union,*
*establish this Constitution in order to form a more perfect union.*

*We believe that all working people and all human beings have a right to a safe and decent living at*
*a reasonable wage and that all members of society are entitled to equal and fair justice.*

*We believe that all people, regardless of race, color, sex, sexual orientation, age, national origin,*
*physical or mental handicap, or creed are entitled to equal opportunity and treatment.*

*We further believe that all members of society should challenge such pernicious evils as racism,*

**marxism**     *
**and capital's domination of labor.**     *

**We also believe that it is important for the working class to ever realize that "in unity there is strength"** *
**and that "an injury to one is an injury to all."** *

**Click here to view and download the PDF of the 2012 National Constitution**
(http://www.npmhu.org/resources/document/2012-NPMHU-National-Constitution-as-printed.pdf)

**Click here to view and download the PDF of the 2012 National and Uniform Local Union Constitutions**
(http://www.npmhu.org/resources/document/2012-National-and-ULUC-FINAL-as-printed-to-booklet-w-cover.pdf)

**Share** (http://addthis.com/bookmark.php?v=250&username=atucomm) **RSS** (http://www.npmhu.org//feed)

## Member Resources (http://www.npmhu.org//resources)     *

### Member Benefits (http://www.npmhu.org/resources/member-benefits) *
- **Wage Charts** (http://www.npmhu.org/resources/wage-charts)
- **National Agreement** (http://www.npmhu.org//resources/agreement)     *
- **Contract Interpretation Manual** (http://www.npmhu.org/resources/contract-interpretation-manual) *
- **MAILS and Shop Steward Resources** (http://ws2.npmhu-research.org/)
- **National Union Constitution** (http://www.npmhu.org//resources/national-constitution)     *
- **Uniform Local Union Constitution** (http://www.npmhu.org//resources/local-constitution) *
- **Merchandise** (http://www.npmhu.org/resources/merchandise)
- **Buy Union. Buy American.** (http://www.npmhu.org//resources/buy-union)

## Mail Handler Update (http://www.npmhu.org//media/update)

### USPS TO RESUME PLANT CLOSINGS AND CONSOLIDATIONS
**Read Online**
(http://www.npmhu.org//media/update/july-2014)

## Latest News (http://www.npmhu.org//media/news)

**Hegarty Addresses Delegates of the 69th Biennial NALC Convention**
(http://www.npmhu.org/media/news/hegarty-addresses-delegates-of-the-69th-biennial-nalc-convention)

**Jul 25** (http://www.npmhu.org/media/news/hegarty-addresses-delegates-of-the-69th-biennial-nalc-convention)

**Union Plus Supports Union Familes with $20K Student Loan Giveaway**
(http://www.npmhu.org/media/news/union-plus-supports-union-familes-with-20k-student-loan-giveaway)

**Jul 23** (http://www.npmhu.org/media/news/union-plus-supports-union-familes-with-20k-student-loan-giveaway)

# About NPMHU (http://www.npmhu.org//about)

# Our Union

### MEMBERS:

The National Postal Mail Handlers Union (NPMHU) is recognized as the exclusive collective bargaining agent for 47,000 Mail Handlers employed by the United States Postal Service. NPMHU membership is open to any Mail Handler of the USPS regardless of race, color, sex, age or national origin. Anyone else employed by the Federal Government or the Postal Service, who does not otherwise qualify for regular membership in the Union, may join as an associate member.

In 2012, the NPMHU reached its centennial mark, celebrating 100 years of service as a key union within the postal community. Mail handlers are an essential part of the mail processing and distribution network utilized by the Postal Service to move more than 165 billion pieces of mail each year. We work in all of the nation's large postal plants, throughout the 50 States and Puerto Rico, where mail handlers are responsible for loading and unloading trucks, transporting mail within the facility (both manually and using powered industrial equipment such as fork-lifts), preparing, sorting, and containerizing the mail for distribution and delivery, and operating a host of machinery and automated equipment.

### PURPOSE:

The NPMHU is a national organization of employees dedicated to advancing the interests of its members and their families. The primary purpose of the Union is to negotiate and enforce a National Agreement with the U.S. Postal Service, a contract that establishes wages, cost-of-living adjustments and other pay increases, working conditions, and fringe benefits for all workers within its jurisdiction. The Union also protects workers' rights by representing them in day-to-day problems on the job, like discipline, violations of seniority, discrimination, or other management abuse, and addresses such work-place concerns as safety, health, and the impact of technological change.



### DEMOCRACY:

The NPMHU is run by its members. Every level of the NPMHU operates democratically on the principle of majority rule. As a member of the NPMHU, you have a right to be heard and the right to vote to express your concerns. All local and national officers are elected by the members by secret mail ballot. Any member can become a candidate for elected office simply by being nominated in accordance with the requirements of the NPMHU Constitution. All members also vote on ratification of the National Agreement, and elect delegates to the National Convention. The Convention convenes every four years and is the highest governing body in the Union. Between Conventions, the National Executive Board directs the Union's policy and programs.

## NATIONAL CONTRACT NEGOTIATIONS:

Mail Handlers employed by the USPS are covered by a National Agreement, which is its collective bargaining agreement covering a wide array of issues relating to wages, hours, benefits, and working conditions. The NPMHU has a National Negotiating Team that meets with the Postal Service management several months before the contract expires. Based on suggestions submitted by rank-and-file Union members, the team



proposes contact language to which the Postal Service responds, and through a concentrated series of discussions, and with the give and take of negotiation, they attempt to reach an agreement that works for everyone.

If a tentative agreement is reached, each and every Mail Handler who is a member of the Union is sent a package containing the details of the tentative agreement, along with a ratification ballot affording the membership the opportunity to either accept or reject the terms of the proposed agreement. Although the NPMHU believes that the right to strike is an inalienable right of all American workers, federal law prohibits strikes by postal employees and requires that contract negotiations not resulting in an agreement be submitted to an impartial third party for binding arbitration. If this occurs, all of the Union's resources are used to obtain the best possible contract for all Mail Handlers.

## CONTRACT ADMINISTRATION:

Once the National Agreement has been established, the officers and representatives of the NPMHU - at the National, Regional, Local, and Branch level - work to police and enforce the contract, and to protect the rights of Mail Handlers on the work room floor. Article 15 of the National Agreement allows Mail Handlers to file grievances with postal management- through their Union Shop Steward - when their contractual rights have been violated. The National Postal Mail Handlers Union is here to protect and represent each and every Mail Handler.

## MEMBERSHIP DUES:

National dues pay for all the operating expenses of the Union. This includes contract negotiations, grievance funding above the local level, and the costs associated with national level arbitration. Members' dues also cover the cost of publications, professional fees, legislative activities, education and training, and community service programs. Dues are very reasonable, and can vary from local to local. Mail Handlers seeking to join the NPMHU should contact their shop steward or local officer, who can advise as to the amount that will automatically be deducted from payroll once a Form 1187 - Authorization for Dues Deduction has been completed.

## GOVERNANCE:

Mail Handler members belong to a local union, with jurisdiction in their city, town, or area. Locals elect their own officers and conduct their own day-to-day business. They negotiate a Local Memorandum of Understanding to





supplement the National Agreement on certain local concerns. Nationally, NPMHU has its headquarters in Washington D.C. to administer the Union and to implement programs and policies mandated by the Constitution and the National Executive Board. The national resident officers include the National President and the National Secretary-Treasurer.

## PROBLEMS:

If a member feels that management has violated their rights, subjected them to harassment, or discriminated against them, that member should immediately discuss the problems with their steward. The steward, who is the front-line Union representative on the workroom floor, will determine whether a violation has occurred and will try to reach a settlement with the member's immediate supervisor. If this effort fails, the Union can appeal management's action to a higher level. If all of these efforts fail, the Union may request that an impartial arbitrator be called in to settle the grievance.

The most important benefit gained from union membership is the power to be heard. NPMHU members can determine their own future by participating in local meetings, voting for local and national officers, voting on the contract, and running for office or petitioning for change throughout the Union.

## AFFILIATIONS:

The NPMHU is affiliated with a variety of other organizations, including the Laborers' International Union of North America, the AFL-CIO, UNI Global Union, and the Postal Employees Relief Fund. All of these organizations work to promote the rights and interests of Mail Handlers. Members of the NPMHU automatically become a member, at no additional cost, of all of these organizations, and become eligible for all benefits that they offer.

## KEEPING CURRENT:

Participating in Union meetings and the activities of the local will ensure that NPMHU members know what is happening, and what issues and concerns are currently being discussed within the Union. In addition, our members are kept informed through the NPMHU National Union website, and with local and national union publications, such as the monthly Mail Handler Update and the quarterly Mail Handler magazine.



## LEGISLATIVE EFFORTS:

The NPMHU maintains a very effective legislative program that monitors legislation being considered by, Congress that will have an impact on postal workers and/or their families. The NPMHU has an active presence on Capitol Hill, and is often invited to testify before House and Senate Committees considering legislation affecting postal and federal employees.

Share (http://addthis.com/bookmark.php?v=250&username=atucomm) RSS (http://www.npmhu.org//feed)

## In About NPMHU (http://www.npmhu.org//about)

*Exhibit 8*

⦿ TheFreeDictionary ○ Google ○ Bing

negligence                    Search ?

⦿ Word / Article ○ Starts with ○ Ends with ○ Text

8,750,929,938 visitors served.

| Dictionary/ thesaurus | Medical dictionary | Legal dictionary | Financial dictionary | Acronyms | Idioms | Encyclopedia | Wikipedia encyclopedia |

**negligence** 🔊 Also found in: Dictionary/thesaurus, Medical, Financial, Encyclopedia, Wikipedia        0.01 sec.

Ads by Google:

What Is Your Claim Worth?

Ⓘ personal-injury-help.us
Free. Ask a Local Lawyer Now. Get Compensated for Pain & Suffering!

Like {174} {8+1} {7}    Share:    Cite / link

Page tools

Printer friendly        Feedback
Cite / link             Add defini

This site:

Like {320k} {8+1} {41k}

Follow:        Share:

On this page
Word Browser

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The concept of negligence developed under English Law. Although English Common Law had long imposed liability for the wrongful acts of others, negligence did not emerge as an independent cause of action until the eighteenth century. Another important concept emerged at that time: legal liability for a failure to act. Originally liability for failing to act was imposed on those who undertook to perform some service and breached a promise to exercise care or skill in performing that service. Gradually the law began to imply a promise to exercise care or skill in the performance of certain services ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The concept of negligence passed from Great Britain to the United States as each state (except Louisiana) adopted the common law of Great Britain (Louisiana adopted the Civil Law of France). Although there have been important developments in negligence law, the basic concepts have remained the same since the eighteenth century. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Even though the majority of people in the community may behave in a certain way, that does not establish the standard of conduct of the reasonable person. For example, a majority of people in a community may jay-walk, but jaywalking might still fall below the community's standards of safe conduct.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Also, a person cannot deny personal knowledge of basic facts commonly known in the community. The reasonable person knows that ice is slippery, that live wires are dangerous ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and that children might run into the street when they are playing. To act as a reasonable person, an individual must even take into account her lack of knowledge of some situations, such as when walking down a dark, unfamiliar corridor.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ such as physicians, lawyers, architects, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Thus, an unlicensed driver who takes his friends for a joyride is held to the standard of conduct of an experienced, licensed driver.

The law does not make a special allowance for beginners with regard to special skills. The learner, beginner, or trainee in a special skill is held to the standard of conduct of persons who are reasonably skilled and

Advertisement (Bad banner? Please let us know

My bookmarks

Please log in or register to use bookmarks. You can also log in with Facebook, Google, or Yahoo.

Advertisement (Bad banner? Please let us know

Charity

Feed your brain, feed a hu

Advertisement (Bad banner? Please let us know

experienced in the activity. Sometimes the beginner is held to a standard he cannot meet. For example, a first-time driver clearly does not possess the experience and skill of an experienced driver. Although it may seem unfair to hold the beginner to the standards of the more experienced person, this standard protects the general public from the risk of a beginner's lack of competence, because the community is usually defenseless to guard against such risks.

**Physical Characteristics** The law takes a person's physical characteristics into account in determining whether that person's conduct is negligent. Whether a person's conduct is reasonable, and therefore not negligent, is measured against a reasonably prudent person with the same physical characteristics. There are two reasons for taking physical characteristics into account. A physically impaired individual cannot be expected to conform to a standard of conduct that would be physically impossible for her to meet. On the other hand, a physically challenged person must act reasonably in light of her handicap, and she may be negligent in taking a risk that is unreasonable in light of her known physical limitations. Thus, it would be negligent for a blind person to drive an automobile.

**Mental Capacity** Although a person's physical characteristics are taken into account in determining negligence, the person's mental capacity is generally ignored and does not excuse the person from acting according to the reasonable person standard. The fact that an individual is lacking in intelligence, judgment, memory, or emotional stability does not excuse the person's failure to act as a reasonably prudent person would have acted under the same circumstances. For example, a person who causes a forest fire by failing to extinguish his campfire cannot claim that he was not negligent because he lacked the intelligence, judgment, or experience to appreciate the risk of an untended campfire.

Similarly, evidence of voluntary intoxication will not excuse conduct that is otherwise negligent. Although intoxication affects a person's judgment, voluntary intoxication will not excuse negligent conduct, because it is the person's conduct, not his or her mental condition, that determines negligence. In some cases a person's intoxication is relevant to determining whether his conduct is negligent, however, because undertaking certain activities, such as driving, while intoxicated poses a danger to others.

**Children** Children may be negligent, but they are not held to the same standard of conduct as adults. A child's conduct is measured against the conduct expected of a child of similar age, intelligence, and experience. Unlike the standard for adults, the standard of reasonable conduct for children takes into account subjective factors such as intelligence and experience. In this sense the standard is less strict than for adults, because children normally do not engage in the high-risk activities of adults and adults dealing with children are expected to anticipate their "childish" behavior.

In many states children are presumed incapable of negligence below a certain age, usually seven years. In some states children between the ages of seven and fourteen years are presumed to be incapable of negligence, although this presumption can be rebutted. Once a person reaches the age of majority, usually eighteen years, she is held to adult standards of conduct.

One major exception to the rules of negligence exists with regard to children. If a child is engaging in what is considered an "adult activity," such as driving an automobile or flying an airplane, the child will be held to an adult standard of care. The higher standard of care imposed for these types of activities is justified by the special skills required to engage in them and the danger they pose to the public.

███████ The law recognizes that even a reasonable person can make errors in judgment █████████ situations. Therefore, a person's conduct in an emergency is evaluated in light of whether it was ██████████ ███████ under the circumstances, even though, in retrospect, another ██████████ ████.

In some circumstances failure to anticipate an emergency may constitute █████████ The reasonable person anticipates, and takes precautions against, foreseeable emergencies. For example, the owner of a theater must consider the possibility of a fire, and the owner of a swimming pool must consider the possibility of a swimmer drowning ██████████ ████████████████████.

Also, a person can be negligent in causing an emergency, even if he acts reasonably during the emergency. A theater owner whose negligence causes a fire, for instance, would be liable for the injuries to the patrons, even if he saved lives during the fire.

**Conduct of Others** Finally, the reasonable person takes into account the conduct of others and regulates his ██ own conduct accordingly. A reasonable person ████████████████████████████████████ ███████████████ Thus, a person may be found negligent for leaving a car unlocked with the keys in the ignition because of the foreseeable risk of theft, or for failing to slow down in the vicinity of a school yard where children might negligently run into the street.

## ████████ Negligence ███

████████ and, the plaintiff has the burden of proving that the defendant did not act as a reasonable person ███ ████████████████████████. The court will instruct the jury as to the standard of conduct required ████████████████████████████████████████ device is judged according to how it ██████████ ███████████████████████████████████ A plaintiff has two ways of proving it███████ ███████████ reasonable person acting █████ The plaintiff may show that the ███████████████████████████ by presenting proof of the type of injury that occurred to the plaintiff. More ██ ████████████████████, and proof of a customary practice, or **Circumstantial Evidence**

████████████████████████████████████████████████████████████. The law prohibits driving through a red traffic light at an intersection. A plaintiff injured by a defendant who ignored a red light can introduce the defendant's violation of the statute as evidence that the defendant acted negligently. However, a plaintiff's evidence that the defendant violated a statute does not always establish that the defendant acted unreasonably. The statute that was violated must have been intended to protect against the particular hazard or type of harm that caused injury to the plaintiff.

Sometimes physical circumstances beyond a person's control can excuse the violation of a statute, such as when the headlights of a vehicle suddenly fail, or when a driver swerves into oncoming traffic to avoid a child who darted into the street. To excuse the violation, the defendant must establish that, in failing to comply with the statute, she acted as a reasonable person would have acted.

████████████ the violation of a statute, regulation, or ordinance enacted to protect against the harm that ███ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

**Experts** Often a plaintiff will need an expert witness to establish that the defendant did not adhere to the conduct expected of a reasonably prudent person in the defendant's circumstances. A juror may be unable to determine from his own experience, for example, if the medicine prescribed by a physician was reasonably appropriate for a patient's illness. Experts may provide the jury with information beyond the common knowledge of jurors, such as scientific theories, data, tests, and experiments. Also, in cases involving professionals such as physicians, experts establish the standard of care expected of the professional. In the above example, the patient might

Bar-Gill, Oren, and Omri Ben-Shahar. 2003. "The Uneasy Case for Comparative Negligence." *American Law and Economics Review* 5 (spring).

Cupp, Richard L., Jr., and Danielle Polage. 2002. "The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis." *New York University Law Review* 77 (October).

Henderson, James A., Jr. 2002. "Why Negligence Dominates Tort." *UCLA Law Review* 50 (December).

**Cross-references**

Alcohol; Automobiles; Good Samaritan Doctrine; Guest Statutes; Last Clear Chance; MacPherson v. Buick Motor Co.; Natural and Probable Consequences; Palsgraf v. Long Island Railroad Company; Product Liability; Rescue; Rylands v. Fletcher; Strict Liability.

West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

## Ask a Lawyer Online Now

legal.justanswer.com
A Lawyer Will Answer in Minutes! Questions Answered Every 9 Seconds.

[heavily redacted paragraph]

or insurance to pay a judgment. Eight states (Connecticut, Massachusetts, New Jersey, Oregon, Rhode Island, Tennessee, Virginia, West Virginia) impose similar liability on the owner, but allow the owner to rebut a presumption that the driver was authorized to use the car. Negligence is one of the greatest sources of civil litigation (along with contract and business disputes) in the United States. (See: contributory negligence, comparative negligence, damages, negligence per se, gross negligence, joint tortfeasors, tortfeasor, tort, liability, res ipsa loquitur)

Copyright © 1981-2005 by Gerald N. Hill and Kathleen T. Hill. All Right reserved.

## Accidental Death & Injury

sweetinamllc.com
Top Rated Law Firm Get What You're Entitled To

**negligence** *noun* abandonment, breach of duty, carelessness, culpa, delinquency, dereliction, disregard, failure, heedlessness, improvidence, imprudence, inadvertency, inattention, inattentiveness, incircumspection, inconsideration, incuria, indifference, inobservance, irresponsibility, lack of attention, lack of diligence, laxity, laxness, neglectfulness, negligentia, obliviousness, omission, oversight, regardlessness, remissness, slackness, unconcern, unmindfulness, unobservance, unwariness, want of thought

[heavily redacted lines] ... Gross negligence is fault; gross fault is [redacted]

See also: delinquency, dereliction, disinterest, disregard, expiration, fault, incompetence, inconsideration, indifference, inertia, laches, lapse, laxity, maladministration, misconduct, misprision, neglect, nonfeasance, nonperformance, omission, oversight, responsibility.

Burton's Legal Thesaurus, 4E. Copyright © 2007 by William C. Burton. Used with permission of The McGraw-Hill Companies, Inc.

[heavily redacted paragraph] ... contracts, torts. When considered in relation to contracts, negligence may be divided into [redacted] ... is, the want of [redacted] ... ary negligence. It is the want of that diligence [redacted] ...

[text obscured] as in the case of a depositary, who is a bailee without reward; Story, Bailm. 62; Dane's Ab. c. 17, a, 2, 14 Serg. & Rawle, 275; but to this general rule, Pothier makes two exceptions. The first, in relation to the contract of a mandate, and the second, to the quasi contract negotiorum gestorum; in these cases, he says, the party undertaking to perform these engagements, is bound to use necessary care. Observation Generale, printed at the end of the Traite des Obligations.

[text obscured] which are for the reciprocal benefit of both parties, such as those of sale, of hiring, of pledge, and the like, the party is bound to take, for the object of the contract, that care which a prudent man [text obscured] takes of his affairs, and he will therefore be held responsible for ordinary neglect. Jones' Bailment, 10, [text obscured] Louis. 505; Bioux. Bailm. Sec. 23; Pothier, Obs. Gener. ubi supra.

[text obscured] In those contracts made for the sole interest of the party who has received, and is to return the thing [text obscured] as in the case of a loan for use, or commodatum, the slightest negligence [text obscured] responsible. Story, Bailm. [text obscured]

7. In general, a party who has neglected [text obscured] 3 Penn. & Watt. 424; 1 Str. 596; [text obscured] on the wrong side of the road, by which he commits an injury to another, 3 East. R. 593; [text obscured] 1 M. & S. 2 Nev. Rep. 119. Vide Gale and Whatley [text obscured]

[text obscured] plaintiff will excuse the negligence of the defendant, see 1 Q. B. [text obscured] Q. & sq. & C. & Finch.

8. When the law imposes a duty on an officer, whether it be by common law or statute, and he neglects to perform it, he may be indicted for such neglect; 1 Salk. R. 380; 6 Mod. R. 96; and in some cases such neglect will amount to a forfeiture of the office. 4 Bl. Com. 140. See Bouv. Inst. Index, h.t.

A Law Dictionary, Adapted to the Constitution and Laws of the United States. By John Bouvier. Published 1856.

Want to thank TFD for its existence? Tell a friend about us, add a link to this page, or visit the webmaster's page for free fun content.

Link to this page:
`<a href="http://legal-dictionary.thefreedictionary.com/negligence">negligence</a>`

Please bookmark with social media, your votes are noticed and appreciated:

Like  174 people like this. Sign Up
to see what your friends like.     [g+1  7]

Advertisement (Bad banner? Please let us know) Remove Ads

| Mentioned in ? | Legal browser ? | Full browser ? |
|---|---|---|
| "But for" Rule | negative compulsion | neglectfully |
| Ambulance Chaser | Negative condition | neglectfulness |
| Assumption of Risk | Negative Covenant | neglectfulness |
| benefits | negative declaration | neglecting |
| Brady Center to Prevent Gun Violence | negative evidence | neglecting |
| breach of duty | Negative pregnant | neglecting |
| Breach of Warranty | negative result | Neglection |
| Bridges | Negative statute | Neglection |
| care | negativistic | Neglection |
| careless | negatory | Neglective |
| carelessness | neglect | neglector of duty |
| Carriers | neglect of obligation | neglects |
| causation | neglect one's duty | neglects |
| comparative negligence | neglect to obey | neglects |
| contributory negligence | neglect to perform | neglegene |
| Criminal Negligence | neglected | neglegentia |
| culpa | neglectful | neglegere |
| delinquency | neglectful of obligation | Negligible |
| dereliction | | |

◉ TheFreeDictionary ○ Google

[Search] ?

◉ Word / Article ○ Starts with ○ Ends with ○ Text

| Free Tools: | For surfers: Free toolbar & extensions | Word of the Day | Bookmark | Help<br>For webmasters: Free content | Linking | Lookup box | Double-click lookup |
|---|---|

Mobile Site | Terms of Use | Privacy policy | Feedback | Advertise with Us | Copyright © 2014 Farlex, Inc. a Mode Partner
Disclaimer
All content on this website, including dictionary, thesaurus, literature, geography, and other reference data is for

Exhibit X 6

Definition of 'Breach of Contract'

Violation of any of the agreed-upon terms and conditions of a binding contract. This breach could be anything from a late payment to a more serious violation, such as failure to deliver a promised asset. A contract is binding and will hold weight if taken to court; however, proof of the violation is imperative.

breach of contract

n. failing to perform any term of a contract, written or oral, without a legitimate legal excuse. This may include not completing a job, not paying in full or on time, failure to deliver all the goods, substituting inferior or significantly different goods, not providing a bond when required, being late without excuse, or any act which shows the party will not complete the work ("anticipatory breach"). Breach of contract is one of the most common causes of law suits for damages and/or court-ordered "specific performance" of the contract.

# Breach of contract

*IZ Exhibit 6*

From Wikipedia, the free encyclopedia

**Breach of contract** is a legal cause of action in which a binding agreement or bargained-for exchange is not honored by one or more of the parties to the contract by non-performance or interference with the other party's performance. If the party does not fulfill his contractual promise, or has given information to the other party that he will not perform his duty as mentioned in the contract or if by his action and conduct he seems to be unable to perform the contract, he is said to breach the contract.[1]

Breach of contract is a type of civil wrong.[2]

## Contents

- 1 Minor breaches
- 2 Material breach
- 3 Fundamental breach
- 4 Anticipatory breach
- 5 See also
- 6 References

## Minor breaches

In a "minor" breach (a partial breach or immaterial breach or where there has been substantial performance), the non-breaching party cannot sue for specific performance, and can only sue for actual damages.

Suppose a homeowner hires a contractor to install new plumbing and insists that the pipes, which will ultimately be hidden behind the walls, must be red. The contractor instead uses blue pipes that function just as well. Although the contractor breached the literal terms of the contract, the homeowner cannot ask a court to order the contractor to replace the blue pipes with red pipes. The homeowner can only recover the amount of his or her actual damages. In this instance, this is the difference in value between red pipe and blue pipe. Since the color of a pipe does not affect its function, the difference in value is zero. Therefore, no damages have been incurred and the homeowner would receive nothing. (*See* Jacob & Youngs v. Kent.)

However, had the pipe colour been specified in the agreement as a *condition*, a breach of that condition would constitute a "major" breach. For example, when a contract specifies time is of the essence and one party to the contract fails to meet a contractual obligation in a timely fashion, the other party could sue for damages for a major breach.

12 6

# Material breach

A *material breach* is any failure to perform that permits the other party to the contract to either compel performance, or collect damages because of the breach. If the contractor in the above example had been instructed to use copper pipes, and instead used iron pipes that would not last as long as the copper pipes would have lasted, the homeowner can recover the cost of actually correcting the breach - taking out the iron pipes and replacing them with copper pipes.

There are exceptions to this. Legal scholars and courts often state that the owner of a house whose pipes are not the specified grade or quality (a typical hypothetical example) cannot recover the cost of replacing the pipes for the following reasons:

1. Economic waste. The law does not favor tearing down or destroying something that is valuable (almost anything with value is "valuable"). In this case, significant destruction of the house would be required to completely replace the pipes, and so the law is hesitant to enforce damages of that nature.[3]

2. Pricing in. In most cases of breach, a party to the contract simply fails to perform one or more terms. In those cases, the breaching party should have already considered the cost to perform those terms and thus "keeps" that cost when they do not perform. That party should not be entitled to keep that savings. However, in the pipe example the contractor never considered the cost of tearing down a house to fix the pipes, and so it is not reasonable to expect them to pay damages of that nature.

Most homeowners would be unable to collect damages that compensate them for replacing the pipes, but rather would be awarded damages that compensate them for the *loss of value* in the house. For example, say the house is worth $125,000 with copper and $120,000 with iron pipes. The homeowner would be able to collect the $5,000 difference, and nothing more.

The Restatement (Second) of Contracts lists the following criteria can be used to determine whether a specific failure constitutes a breach:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

American Law Institute, Restatement (Second) of Contracts § 241 (1981)

# Fundamental breach

A *fundamental breach* (or *repudiatory breach*) is a breach so fundamental that it permits the aggrieved

party to terminate performance of the contract. In addition that party is entitled to sue for damages.

## Anticipatory breach

A *breach by anticipatory repudiation* (or simply *anticipatory breach*) is an unequivocal indication that the party will not perform when performance is due, or a situation in which future non-performance is inevitable. An anticipatory breach gives the non-breaching party the option to treat such a breach as immediate, and, if repudiatory, to terminate the contract and sue for damages (without waiting for the breach to actually take place). For example, A contracts with B on January 1 to sell 500 quintals of wheat and to deliver it on May 1. Subsequently, on April 15 A writes to B and says that he will not deliver the wheat. B may immediately consider the breach to have occurred and file a suit for damages for the scheduled performance, even though A has until May 1 to perform.

Example: if Company A refuses to pay substantial interim payments to Company B, Company B can begin legal action due to anticipatory breach. Company B could also stop performing its contractual obligation, potentially saving time and or money.

## See also

- anticipatory repudiation
- contract
- fundamental breach
- lawsuit
- terms of use
- lost volume seller

## References

1. ^ "Law Office of Chisholm & Shuttie" (http://bizlawfirm.com/all-practice-areas/breach-of-contract/).
2. ^ Glanville Williams. Learning the Law. Eleventh Edition. Stevens. 1982. p. 9
3. ^ "Peevyhouse v Garland Coal & Mining" (http://en.wikipedia.org/wiki/Peevyhouse_v._Garland_Coal_&_Mining_Co.).

Retrieved from "http://en.wikipedia.org/w/index.php?title=Breach_of_contract&oldid=614192704"
Categories: Contract law

---

- This page was last modified on 24 June 2014 at 06:23.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Exhibit 6

In contract law, a "material" breach of contract is a breach (a failure to perform the contract) that strikes so deeply at the heart of the contract that it renders the agreement "irreparably broken" and defeats the purpose of making the contract in the first place. The breach must go to the very root of the agreement between the parties. If there is a material breach (sometimes referred to as a "total" breach), the other party can simply end the agreement and go to court to try to collect damages caused by the breach.



Exhibit ~~15~~ 7



SEARCH

A to Z Index | Newsroom | Contact Us | FAQs | About OSHA

OSHA    SHARE          OSHA QuickTakes Newsletter    RSS Feeds                    ★ Was this page helpful?

We Can Help                                      What's New | Offices

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business | Anti-Retaliation |

eTools Home :  Powered Industrial Trucks                              Safety and Health Topic Page | Credits

Types & Fundamentals    Operating the Forklift    The Workplace    Training Assistance

**The Workplace**
- Physical Conditions
- **Pedestrian Traffic**
- Ramps and Grades
- Loading Docks
- Narrow Aisles
- Elevators
- Enclosed Areas

## Understanding the Workplace:
## Pedestrian Traffic

Many pedestrians or bystanders are injured in forklift-related accidents. These injuries can occur when forklifts strike pedestrians or when pedestrians are struck by falling loads.

- Pedestrian Traffic
- Moving Personnel
- Maintain Distance

**Figure 1. Operator cautioning pedestrian to stop.**

**Additional Resources:**

- NIOSH Alert: Preventing Injuries and Deaths of Workers Who Operate or Work Near Forklifts, DHHS (NIOSH) Publication No. 2001-109, (2001, June). Forklift overturns are the leading cause of fatalities involving forklifts; they represent about 25 percent of all forklift-related deaths.

should always be aware of conditions in their workplace,

**Figure 2. Yield right of way to pedestrians.**

of getting pedestrians and objects

**Requirements and Recommended Practices:**

of way to pedestrians.

a person or group of people walks across your planned route:

until the pedestrians pass by.

cautiously through any congested area.

- If an area is cluttered, walk the route first to spot problems.
    - Check for situations that require a spotter and use one when traveling.

pedestrians, by asking them to move, if there is not

at blind corners, doorways and aisles.

- Sound the horn or other alarm when you back up.

**Figure 3. Slow down, stop and sound horn at intersections and wherever your vision is obstructed.**

for the Driver

stop and sound horn at intersections, corners, and whenever vision is obstructed.

- When provided, use flashing warning light or backup alarms when traveling in reverse.

- ███████████ the truck if you do not have a clear view of travel. 

- Use a spotter for blind spots.

- ███████ look in the direction of travel. 

- Keep a clear view.

- ██████ stop, travel, steer and brake smoothly. ·

- ████████████ to stand clear.

- Do not allow anyone to stand or pass under the load or lifting mechanism.

- ██ When possible, make eye contact with pedestrians or other forklift operators.

Figure 4. Sign posted in area with high pedestrian traffic.

**Reminders for the Pedestrians:**

- Be aware that lift trucks cannot stop suddenly. They are designed to stop slowly to minimize load damage and maintain stability.

- Stand clear of lift trucks in operation.

- Avoid a run-in. The driver's visibility may be limited due to blind spots.

- Be aware of the wide rear swing radius.

- Use pedestrian walkways, or stay to one side of the equipment aisle.

- Never ride on a forklift, unless authorized and the forklift is designed for riders.

- Never pass under an elevated load.

**████████ for Plant Safety Managers:**

██████████████████████████████████████████████████████

- Consider separating pedestrians from lift trucks by providing:

  - Pedestrian walkways,

  - Permanent railings or other protective barriers,

  - Adequate walking space at least on one side, if pedestrians must use equipment aisles,

  - Pedestrian walkway striping on the floor, if barriers cannot be used.

- Install convex mirrors at blind aisle intersections.

- Post traffic control signs.

- Post plant speed limits.

---

**Moving Personnel**

Passengers should not be allowed on forklifts unless the forklift is specifically designed to accommodate passengers.

**Potential Hazards:**

- Danger of falling

**Requirements and Recommended Practices:**

- The OSHA standard [29 CFR 1910.178(m)(3)] states that unauthorized personnel are prohibited from riding on a forklift. If riders are authorized, a safe place must be provided.

- Unless authorized, never carry passengers — NO RIDERS.

- Use only specialized equipment designed to raise personnel.

- Never transport employees on a platform. Employees can only be hoisted up and down.

- Never transport employees on the forks.



Figure 5. Do not carry passengers.



Figure 6. Specialized platform for lifting coworker. Note: There is a guard on the back of the platform to keep the person in the platform and protect the worker's arms and hands.



operators should keep a safe distance from workers on foot and other vehicles.

Potential Hazards:

- Danger of striking pedestrians

Requirements and Recommended Practices:

- Warn pedestrians of your approach by horn, hand signal, or warning system.

- Maintain a safe clearance from coworkers.

- Employees should stay out of the potential path where a load can fall.

Figure 7. Operator signaling to coworker to stand back.

| Types & Fundamentals | Operating the Forklift | Understanding the Workplace | Training Assistance |

eTools Home :   Powered Industrial Trucks                                           Safety and Health Topic Page | Credits

Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  International  |  Contact Us

U.S. Department of Labor  |  Occupational Safety & Health Administration  |  200 Constitution Ave., NW, Washington, DC 20210
Telephone: 800-321-OSHA (6742)  |  TTY

www.OSHA.gov



**UNITED STATES**
**DEPARTMENT OF LABOR**

SHARE

OSHA QuickTakes Newsletter  RSS Feeds  ⭐ Was this page helpful?

**Occupational Safety & Health Administration · We Can Help**

What's New | Offices
OSHA

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business | Anti-Retaliation |

Regulations (Standards - 29 CFR) - Table of Contents

- **Part Number:** 1910
- **Part Title:** Occupational Safety and Health Standards
- **Subpart:** N
- **Subpart Title:** Materials Handling and Storage
- **Standard Number:** 1910.176
- **Title:** Handling materials - general.

**1910.176**

Use of mechanical equipment. Where mechanical handling equipment is used, sufficient safe clearances shall be allowed for aisles, at loading docks, through doorways and wherever turns or passage must be made. Aisles and passageways shall be kept clear and in good repair, with no obstruction across or in aisles that could create a hazard. Permanent aisles and passageways shall be appropriately marked.

**1910.176(b)**

Secure storage. Storage of material shall not create a hazard. Bags, containers, bundles, etc., stored in tiers shall be stacked, blocked, interlocked and limited in height so that they are stable and secure against sliding or collapse.

**1910.176(c)**

Housekeeping. Storage areas shall be kept free from accumulation of materials that constitute hazards from tripping, fire, explosion, or pest harborage. Vegetation control will be exercised when necessary.

**1910.176(d)**

[Reserved]

**1910.176(e)**

Clearance limits. Clearance signs to warn of clearance limits shall be provided.

**..1910.176(f)**

**1910.176(f)**

Rolling railroad cars. Derail and/or bumper blocks shall be provided on spur railroad tracks where a rolling car could contact other cars being worked, enter a building, work or traffic area.

**1910.176(g)**

Guarding. Covers and/or guard- rails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc.

[39 FR 23052, June 27, 1974, as amended at 43 FR 49749, Oct. 24, 1978]

Next Standard (1910.177)

Regulations (Standards - 29 CFR) - Table of Contents

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Important Web Site Notices | International | Contact Us

U.S. Department of Labor | Occupational Safety and Health Administration | 200 Constitution Ave., NW, Washington, DC 20210

Telephone: 800-321-OSHA (6742) | TTY

www.OSHA.gov

UNITED STATES
DEPARTMENT OF LABOR

SHARE

OSHA QuickTakes Newsletter  RSS Feeds  ★ Was this page helpful?

Occupational Safety & Health Administration   We Can Help

What's New | Offices
OSHA

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business | Anti-Retaliation |

Regulations (Standards - 29 CFR) - Table of Contents

- **Part Number:** 1910
- **Part Title:** Occupational Safety and Health Standards
- **Subpart:** N
- **Subpart Title:** Materials Handling and Storage
- **Standard Number:** 1910.178
- **Title:** Powered industrial trucks.
- **Appendix:** A

**1910.178(a)**

General requirements.

**1910.178(a)(1)**

This section contains safety requirements relating to fire protection, design, maintenance, and use of fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines. This section does not apply to compressed air or nonflammable compressed gas-operated industrial trucks, nor to farm vehicles, nor to vehicles intended primarily for earth moving or over-the-road hauling.

**1910.178(a)(2)**

All new powered industrial trucks acquired and used by an employer shall meet the design and construction requirements for powered industrial trucks established in the "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1-1969", which is incorporated by reference as specified in § 1910.6, except for vehicles intended primarily for earth moving or over-the-road hauling.

**1910.178(a)(3)**

Approved trucks shall bear a label or some other identifying mark indicating approval by the testing laboratory. See paragraph (a)(7) of this section and paragraph 405 of "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1-1969", which is incorporated by reference in paragraph (a)(2) of this section and which provides that if the powered industrial truck is accepted by a nationally recognized testing laboratory it should be so marked.

**1910.178(a)(4)**

Modifications and additions which affect capacity and safe operation shall not be performed by the customer or user without manufacturers prior written approval. Capacity, operation, and maintenance instruction plates, tags, or decals shall be changed accordingly.

**1910.178(a)(5)**

If the truck is equipped with front-end attachments other than factory installed attachments, the user shall request that the truck be marked to identify the attachments and show the approximate weight of the truck and attachment combination at maximum elevation with load laterally centered.

**1910.178(a)(6)**

The user shall see that all nameplates and markings are in place and are maintained in a legible condition.

**1910.178(a)(7)**

As used in this section, the term, "approved truck" or "approved industrial truck" means a truck that is listed or approved for fire safety purposes for the intended use by a nationally recognized testing laboratory, using nationally recognized testing standards. Refer to 1910.155(c)(3)(iv)(A) for definition of nationally recognized testing laboratory.

**1910.178(b)**

Designations. For the purpose of this standard there are eleven different designations of industrial trucks or tractors as follows: D, DS, DY, E, ES, EE, EX, G, GS, LP, and LPS.

**1910.178(b)(1)**

The D designated units are units similar to the G units except that they are diesel engine powered instead of gasoline engine powered.

**1910.178(b)(2)**

The DS designated units are diesel powered units that are provided with additional safeguards to the exhaust, fuel and electrical systems. They may be used in some locations where a D unit may not be considered suitable.

**1910.178(b)(3)**

The DY designated units are diesel powered units that have all the safeguards of the DS units and in addition do not have any electrical equipment including the ignition and are equipped with temperature limitation features.

**1910.178(b)(4)**

The E designated units are electrically powered units that have minimum acceptable safeguards against inherent fire hazards.

**1910.178(b)(5)**

The ES designated units are electrically powered units that, in addition to all of the requirements for the E units, are provided with additional safeguards to the electrical system to prevent emission of hazardous sparks and to limit surface temperatures. They may be used in some locations where the use of an E unit may not be considered suitable.

**1910.178(b)(6)**

The EE designated units are electrically powered units that have, in addition to all of the requirements for the E and ES units, the electric motors and all other electrical equipment completely enclosed. In certain locations the EE unit may be used where the use of an E and ES unit may not be considered suitable.

constructed and assembled that the units may be used in certain atmospheres containing flammable vapors or dusts.

**1910.178(b)(8)**

The G designated units are gasoline powered units having minimum acceptable safeguards against inherent fire hazards.

**1910.178(b)(9)**

The GS designated units are gasoline powered units that are provided with additional safeguards to the exhaust, fuel, and electrical systems. They may be used in some locations where the use of a G unit may not be considered suitable.

**1910.178(b)(10)**

The LP designated unit is similar to the G unit except that liquefied petroleum gas is used for fuel instead of gasoline.

**1910.178(b)(11)**

The LPS designated units are liquefied petroleum gas powered units that are provided with additional safeguards to the exhaust, fuel, and electrical systems. They may be used in some locations where the use of an LP unit may not be considered suitable.

and the type of industrial truck required shall be as provided in paragraph (d) of this section for such locations.

**1910.178(c)**

Designated locations.

**1910.178(c)(1)**

The industrial trucks specified under subparagraph (2) of this paragraph are the minimum types required but industrial trucks having greater safeguards may be used if desired.

**1910.178(c)(2)**

For specific areas of use see Table N-1 which tabulates the information contained in this section. References are to the corresponding classification as used in subpart S of this part.

**1910.178(c)(2)(i)**

Power-operated industrial trucks shall not be used in atmospheres containing hazardous concentration of acetylene, butadiene, ethylene oxide, hydrogen (or gases or vapors equivalent in hazard to hydrogen, such as manufactured gas), propylene oxide, acetaldehyde, cyclopropane, diethyl ether, ethylene, isoprene, or unsymmetrical dimethyl hydrazine (UDMH).

**1910.178(c)(2)(ii)**

-

**1910.178(c)(2)(ii)(a)**

Power-operated industrial trucks shall not be used in atmospheres containing hazardous concentrations of metal dust, including aluminum, magnesium, and their commercial alloys, other metals of similarly hazardous characteristics, or in atmospheres containing carbon black, coal or coke dust except approved power-operated industrial trucks designated as EX may be used in such atmospheres.

**1910.178(c)(2)(ii)(b)**

In atmospheres where dust of magnesium, aluminum or aluminum bronze may be present, fuses, switches, motor controllers, and circuit breakers of trucks shall have enclosures specifically approved for such locations.

**1910.178(c)(2)(iii)**

Only approved power-operated industrial trucks designated as EX may be used in atmospheres containing acetone, acrylonitrile, alcohol, ammonia, benzine, benzol, butane, ethylene dichloride, gasoline, hexane, lacquer solvent vapors, naphtha, natural gas, propane, propylene, styrene, vinyl acetate, vinyl chloride, or xylenes in quantities sufficient to produce explosive or ignitable mixtures and where such concentrations of these gases or vapors exist continuously, intermittently or periodically under normal operating conditions or may exist frequently because of repair, maintenance operations, leakage, breakdown or faulty operation of equipment.

**1910.178(c)(2)(iv)**

Power-operated industrial trucks designated as DY, EE, or EX may be used in locations where volatile flammable liquids or flammable gases are handled, processed or used, but in which the hazardous liquids, vapors or gases will normally be confined within closed containers or closed systems from which they can escape only in case of accidental rupture or breakdown of such containers or systems, or in the case of abnormal operation of equipment; also in locations in which hazardous concentrations of gases or vapors are normally prevented by positive mechanical ventilation but which might become hazardous through failure or abnormal operation of the ventilating equipment; or in locations which are adjacent to Class I, Division 1 locations, and to which hazardous concentrations of gases or vapors might occasionally be communicated unless such communication is prevented by adequate positive-pressure ventilation from a source of clear air, and effective safeguards against ventilation failure are provided.

If general industrial or commercial properties are hazardous, only approved power-operated industrial trucks specified for such locations in this paragraph (c) (2) shall be used. If not classified as hazardous, any approved power-operated industrial truck designated as Type D, E, G, or LP may be used, or trucks which conform to the requirements of these types may be used.

**1910.178(d)**

Converted industrial trucks. Power-operated industrial trucks that have been originally approved for the use of gasoline for fuel, when converted to the use of liquefied petroleum gas fuel in accordance with paragraph (q) of this section, may be used in those locations where G, GS or LP, and LPS designated trucks have been specified in the preceding paragraphs.



**1910.178(e)(1)**

High Lift Rider trucks shall be fitted with an overhead guard manufactured in accordance with paragraph (a) (2) of this section, unless operating conditions do not permit.

**1910.178(e)(2)**

If the type of load presents a hazard, the user shall equip fork trucks with a vertical load backrest extension manufactured in accordance with paragraph (a) (2) of this section.

**1910.178(f)**

Fuel handling and storage.

**1910.178(f)(1)**

The storage and handling of liquid fuels such as gasoline and diesel fuel shall be in accordance with NFPA Flammable and Combustible Liquids Code (NFPA No. 30-1969), which is incorporated by reference as specified in Sec. 1910.6.

**1910.178(f)(2)**

The storage and handling of liquefied petroleum gas fuel shall be in accordance with NFPA Storage and Handling of Liquefied Petroleum Gases (NFPA No. 58-1969), which is incorporated by reference as specified in Sec. 1910.6.

**1910.178(g)**

Changing and charging storage batteries.

**1910.178(g)(1)**

Battery charging installations shall be located in areas designated for that purpose.

**1910.178(g)(2)**

Facilities shall be provided for flushing and neutralizing spilled electrolyte, for fire protection, for protecting charging apparatus from damage by trucks, and for adequate ventilation for dispersal of fumes from gassing batteries.

**1910.178(g)(3)**

[Reserved]

**1910.178(g)(4)**

A conveyor, overhead hoist, or equivalent material handling equipment shall be provided for handling batteries.

**1910.178(g)(5)**

Reinstalled batteries shall be properly positioned and secured in the truck.

**1910.178(g)(6)**

A carboy tilter or siphon shall be provided for handling electrolyte.

**1910.178(g)(7)**

When charging batteries, acid shall be poured into water; water shall not be poured into acid.

**1910.178(g)(8)**

Trucks shall be properly positioned and brake applied before attempting to change or charge batteries.

**1910.178(g)(9)**

Care shall be taken to assure that vent caps are functioning. The battery (or compartment) cover(s) shall be open to dissipate heat.

**1910.178(g)(11)**
Precautions shall be taken to prevent open flames, sparks, or electric arcs in battery charging areas.

**1910.178(g)(12)**
Tools and other metallic objects shall be kept away from the top of uncovered batteries.

**1910.178(h)**
Lighting for operating areas.

**1910.178(h)(1)**
[Reserved]

**1910.178(h)(2)**
Where general lighting is less than 2 lumens per square foot, auxiliary directional lighting shall be provided on the truck.

**1910.178(i)**
Control of noxious gases and fumes.

**1910.178(i)(1)**
Concentration levels of carbon monoxide gas created by powered industrial truck operations shall not exceed the levels specified in 1910.1000.

**1910.178(j)**
Dockboards (bridge plates). See 1910.30(a).

**1910.178(k)**
Trucks and railroad cars.

**1910.178(k)(1)**
The brakes of highway trucks shall be set and wheel chocks placed under the rear wheels to prevent the trucks from rolling while they are boarded with powered industrial trucks.

**1910.178(k)(2)**
Wheel stops or other recognized positive protection shall be provided to prevent railroad cars from moving during loading or unloading operations.

**1910.178(k)(3)**
Fixed jacks may be necessary to support a semitrailer and prevent upending during the loading or unloading when the trailer is not coupled to a tractor.

**1910.178(k)(4)**
Positive protection shall be provided to prevent railroad cars from being moved while dockboards or bridge plates are in position.

**1910.178(l)**
Operator training.

**1910.178(l)(1)**
*Safe operation.*

**1910.178(l)(1)(i)**
The employer shall ensure that each powered industrial truck operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this paragraph (l).

**1910.178(l)(1)(ii)**
Prior to permitting an employee to operate a powered industrial truck (except for training purposes), the employer shall ensure that each operator has successfully completed the training required by this paragraph (l), except as permitted by paragraph (l)(5).

**1910.178(l)(2)**
*Training program implementation.*

**1910.178(l)(2)(i)**
Trainees may operate a powered industrial truck only:

**1910.178(l)(2)(i)(A)**

**1910.178(l)(2)(i)(B)**

Where such operation does not endanger the trainee or other employees.

**1910.178(l)(2)(ii)**

Training shall consist of a combination of formal instruction (e.g., lecture, discussion, interactive computer learning, video tape, written material), practical training (demonstrations performed by the trainer and practical exercises performed by the trainee), and evaluation of the operator's performance in the workplace.

**1910.178(l)(2)(iii)**

All operator training and evaluation shall be conducted by persons who have the knowledge, training, and experience to train powered industrial truck operators and evaluate their competence.

**1910.178(l)(3)**

*Training program content.* Powered industrial truck operators shall receive initial training in the following topics, except in topics which the employer can demonstrate are not applicable to safe operation of the truck in the employer's workplace.

**1910.178(l)(3)(i)**

Truck-related topics:

**1910.178(l)(3)(i)(A)**

Operating instructions, warnings, and precautions for the types of truck the operator will be authorized to operate;

**1910.178(l)(3)(i)(B)**

Differences between the truck and the automobile;

**1910.178(l)(3)(i)(C)**

Truck controls and instrumentation: where they are located, what they do, and how they work;

**1910.178(l)(3)(i)(D)**

Engine or motor operation;

**1910.178(l)(3)(i)(E)**

Steering and maneuvering;

**1910.178(l)(3)(i)(F)**

Visibility (including restrictions due to loading);

**1910.178(l)(3)(i)(G)**

Fork and attachment adaptation, operation, and use limitations;

**1910.178(l)(3)(i)(H)**

Vehicle capacity;

**1910.178(l)(3)(i)(I)**

Vehicle stability;

**1910.178(l)(3)(i)(J)**

Any vehicle inspection and maintenance that the operator will be required to perform;

**1910.178(l)(3)(i)(K)**

Refueling and/or charging and recharging of batteries;

**1910.178(l)(3)(i)(L)**

Operating limitations;

**1910.178(l)(3)(i)(M)**

Any other operating instructions, warnings, or precautions listed in the operator's manual for the types of vehicle that the employee is being trained to operate.

**1910.178(l)(3)(ii)**

Workplace-related topics:

Surface conditions where the vehicle will be operated;

**1910.178(l)(3)(ii)(B)**

Composition of loads to be carried and load stability;

**1910.178(l)(3)(ii)(C)**

Load manipulation, stacking, and unstacking;

**1910.178(l)(3)(ii)(D)**

Pedestrian traffic in areas where the vehicle will be operated;

**1910.178(l)(3)(ii)(E)**

Narrow aisles and other restricted places where the vehicle will be operated;

**1910.178(l)(3)(ii)(F)**

Hazardous (classified) locations where the vehicle will be operated;

**1910.178(l)(3)(ii)(G)**

Ramps and other sloped surfaces that could affect the vehicle's stability;

**1910.178(l)(3)(ii)(H)**

Closed environments and other areas where insufficient ventilation or poor vehicle maintenance could cause a buildup of carbon monoxide or diesel exhaust;

**1910.178(l)(3)(ii)(I)**

Other unique or potentially hazardous environmental conditions in the workplace that could affect safe operation.

**1910.178(l)(3)(iii)**

The requirements of this section.

**1910.178(l)(4)**

*Refresher training and evaluation.*

**1910.178(l)(4)(i)**

Refresher training, including an evaluation of the effectiveness of that training, shall be conducted as required by paragraph (l)(4)(ii) to ensure that the operator has the knowledge and skills needed to operate the powered industrial truck safely.

**1910.178(l)(4)(ii)**

Refresher training in relevant topics shall be provided to the operator when:

**1910.178(l)(4)(ii)(A)**

The operator has been observed to operate the vehicle in an unsafe manner;

**1910.178(l)(4)(ii)(B)**

The operator has been involved in an accident or near-miss incident;

**1910.178(l)(4)(ii)(C)**

The operator has received an evaluation that reveals that the operator is not operating the truck safely;

**1910.178(l)(4)(ii)(D)**

The operator is assigned to drive a different type of truck; or

**1910.178(l)(4)(ii)(E)**

A condition in the workplace changes in a manner that could affect safe operation of the truck.

**1910.178(l)(4)(iii)**

An evaluation of each powered industrial truck operator's performance shall be conducted at least once every three years.

**1910.178(l)(5)**

*Avoidance of duplicative training.* If an operator has previously received training in a topic specified in paragraph (l)(3) of this section, and such training is appropriate to the truck and working conditions encountered, additional training in that topic is not required if the operator has been evaluated and found competent to operate the truck safely.

> **Certification.** The employer shall certify that each operator has been trained and evaluated as required by this paragraph (l). The certification shall include the name of the operator, the date of the training, the date of the evaluation, and the identity of the person(s) performing the training or evaluation.

**1910.178(l)(7)**

> **Dates.** The employer shall ensure that operators of powered industrial trucks are trained, as appropriate, by the dates shown in the following table.

```
                                 |
                                 |
   If the employee was hired: |   The intial training and evaluation of that
                                 |   must be completed:
                                 |
                                 |
 Before December 1, 1999 ... | By December 1, 1999.
 After December 1, 1999 .... | Before the employee is assigned to operate a
                                 | powered industrial truck.
                                 |
```

**1910.178(l)(8)**

> Appendix A to this section provides non-mandatory guidance to assist employers in implementing this paragraph (l). This appendix does not add to, alter, or reduce the requirements of this section.

**1910.178(m)**

> **Truck operations.**

**1910.178(m)(1)**

> Trucks shall not be driven up to anyone standing in front of a bench or other fixed object.

**1910.178(m)(2)**

> No person shall be allowed to stand or pass under the elevated portion of any truck, whether loaded or empty.

**1910.178(m)(3)**

> Unauthorized personnel shall not be permitted to ride on powered industrial trucks. A safe place to ride shall be provided where riding of trucks is authorized.

**1910.178(m)(4)**

> The employer shall prohibit arms or legs from being placed between the uprights of the mast or outside the running lines of the truck.

**1910.178(m)(5)**

>

**1910.178(m)(5)(i)**

> When a powered industrial truck is left unattended, load engaging means shall be fully lowered, controls shall be neutralized, power shall be shut off, and brakes set. Wheels shall be blocked if the truck is parked on an incline.

**1910.178(m)(5)(ii)**

> A powered industrial truck is unattended when the operator is 25 ft. or more away from the vehicle which remains in his view, or whenever the operator leaves the vehicle and it is not in his view.

**1910.178(m)(5)(iii)**

> When the operator of an industrial truck is dismounted and within 25 ft. of the truck still in his view, the load engaging means shall be fully lowered, controls neutralized, and the brakes set to prevent movement.

**1910.178(m)(6)**

> A safe distance shall be maintained from the edge of ramps or platforms while on any elevated dock, or platform or freight car. Trucks shall not be used for opening or closing freight doors.

**1910.178(m)(7)**

> Brakes shall be set and wheel blocks shall be in place to prevent movement of trucks, trailers, or railroad cars while loading or unloading. Fixed jacks may be necessary to support a semitrailer during loading or unloading when the trailer is not coupled to a tractor. The flooring of trucks, trailers, and railroad cars shall be checked for breaks and weakness before they are driven onto.

**1910.178(m)(8)**

**1910.178(m)(9)**

An overhead guard shall be used as protection against falling objects. It should be noted that an overhead guard is intended to offer protection from the impact of small packages, boxes, bagged material, etc., representative of the job application, but not to withstand the impact of a falling capacity load.

**1910.178(m)(10)**

A load backrest extension shall be used whenever necessary to minimize the possibility of the load or part of it from falling rearward.

**1910.178(m)(11)**

Only approved industrial trucks shall be used in hazardous locations.

**1910.178(m)(12)**

[Removed and Reserved]

**1910.178(m)(13)**

[Reserved]

**1910.178(m)(14)**

Fire aisles, access to stairways, and fire equipment shall be kept clear.

**1910.178(n)**

**Traveling.**

**1910.178(n)(1)**

All traffic regulations shall be observed, including authorized plant speed limits. A safe distance shall be maintained approximately three truck lengths from the truck ahead, and the truck shall be kept under control at all times.

**1910.178(n)(2)**

The right of way shall be yielded to ambulances, fire trucks, or other vehicles in emergency situations.

**1910.178(n)(3)**

Other trucks traveling in the same direction at intersections, blind spots, or other dangerous locations shall not be passed.

**1910.178(n)(4)**

The driver shall be required to slow down and sound the horn at cross aisles and other locations where vision is obstructed. If the load being carried obstructs forward view, the driver shall be required to travel with the load trailing.

**1910.178(n)(5)**

Railroad tracks shall be crossed diagonally wherever possible. Parking closer than 8 feet from the center of railroad tracks is prohibited.

**1910.178(n)(6)**

The driver shall be required to look in the direction of, and keep a clear view of the path of travel.

**1910.178(n)(7)**

Grades shall be ascended or descended slowly.

**1910.178(n)(7)(i)**

When ascending or descending grades in excess of 10 percent, loaded trucks shall be driven with the load upgrade.

**1910.178(n)(7)(ii)**

[Reserved]

**1910.178(n)(7)(iii)**

On all grades the load and load engaging means shall be tilted back if applicable, and raised only as far as necessary to clear the road surface.

**1910.178(n)(8)**

Under all travel conditions the truck shall be operated at a speed that will permit it to be brought to a stop in a safe manner.

**1910.178(n)(9)**

**1910.178(n)(10)**

**1910.178(n)(11)**

Dockboard or bridgeplates, shall be properly secured before they are driven over. Dockboard or bridgeplates shall be driven over carefully and slowly and their rated capacity never exceeded.

**1910.178(n)(12)**

Elevators shall be approached slowly, and then entered squarely after the elevator car is properly leveled. Once on the elevator, the controls shall be neutralized, power shut off, and the brakes set.

**1910.178(n)(13)**

Motorized hand trucks must enter elevator or other confined areas with load end forward.

**1910.178(n)(14)**

Running over loose objects on the roadway surface shall be avoided.

**1910.178(n)(15)**

While negotiating turns, speed shall be reduced to a safe level by means of turning the hand steering wheel in a smooth, sweeping motion. Except when maneuvering at a very low speed, the hand steering wheel shall be turned at a moderate, even rate.

**1910.178(o)**

Loading.

**1910.178(o)(1)**

Only stable or safely arranged loads shall be handled. Caution shall be exercised when handling off-center loads which cannot be centered.

**1910.178(o)(2)**

Only loads within the rated capacity of the truck shall be handled.

**1910.178(o)(3)**

The long or high (including multiple-tiered) loads which may affect capacity shall be adjusted.

**1910.178(o)(4)**

Trucks equipped with attachments shall be operated as partially loaded trucks when not handling a load.

**1910.178(o)(5)**

A load engaging means shall be placed under the load as far as possible; the mast shall be carefully tilted backward to stabilize the load.

**1910.178(o)(6)**

Extreme care shall be used when tilting the load forward or backward, particularly when high tiering. Tilting forward with load engaging means elevated shall be prohibited except to pick up a load. An elevated load shall not be tilted forward except when the load is in a deposit position over a rack or stack. When stacking or tiering, only enough backward tilt to stabilize the load shall be used.

**1910.178(p)**

Operation of the truck.

**1910.178(p)(1)**

If at any time a powered industrial truck is found to be in need of repair, defective, or in any way unsafe, the truck shall be taken out of service until it has been restored to safe operating condition.

**1910.178(p)(2)**

Fuel tanks shall not be filled while the engine is running. Spillage shall be avoided.

**1910.178(p)(3)**

Spillage of oil or fuel shall be carefully washed away or completely evaporated and the fuel tank cap replaced before restarting engine.

**1910.178(p)(4)**

No truck shall be operated with a leak in the fuel system until the leak has been corrected.

**1910.178(p)(5)**

Open flames shall not be used for checking electrolyte level in storage batteries or gasoline level in fuel tanks.

**1910.178(q)**

Any power-operated industrial truck not in safe operating condition shall be removed from service. All repairs shall be made by authorized personnel.

**1910.178(q)(2)**

No repairs shall be made in Class I, II, and III locations.

**1910.178(q)(3)**

Those repairs to the fuel and ignition systems of industrial trucks which involve fire hazards shall be conducted only in locations designated for such repairs.

**1910.178(q)(4)**

Trucks in need of repairs to the electrical system shall have the battery disconnected prior to such repairs.

**1910.178(q)(5)**

All parts of any such industrial truck requiring replacement shall be replaced only by parts equivalent as to safety with those used in the original design.

**1910.178(q)(6)**

[text partially obscured] they were when originally received from the manufacturer, nor shall they [text obscured] except as [text obscured] of work trucks shall not be done unless approved by the [text obscured]

**1910.178(q)(7)**

Industrial trucks shall be examined before being placed in service, and shall not be placed in service if the examination shows any condition adversely affecting the safety of the vehicle. Such examination shall be made at least daily. Where industrial trucks are used on a round-the-clock basis, they shall be examined after each shift. Defects when found shall be immediately reported and corrected.

**1910.178(q)(8)**

Water mufflers shall be filled daily or as frequently as is necessary to prevent depletion of the supply of water below 75 percent of the filled capacity. Vehicles with mufflers having screens or other parts that may become clogged shall not be operated while such screens or parts are clogged. Any vehicle that emits hazardous sparks or flames from the exhaust system shall immediately be removed from service, and not returned to service until the cause for the emission of such sparks and flames has been eliminated.

**1910.178(q)(9)**

When the temperature of any part of any truck is found to be in excess of its normal operating temperature, thus creating a hazardous condition, the vehicle shall be removed from service and not returned to service until the cause for such overheating has been eliminated.

**1910.178(q)(10)**

Industrial trucks shall be kept in a clean condition, free of lint, excess oil, and grease. Noncombustible agents should be used for cleaning trucks. Low flash point (below 100 deg. F.) solvents shall not be used. High flash point (at or above 100 deg. F.) solvents may be used. Precautions regarding toxicity, ventilation, and fire hazard shall be consonant with the agent or solvent used.

**1910.178(q)(11)**

[Reserved]

**1910.178(q)(12)**

Industrial trucks originally approved for the use of gasoline for fuel may be converted to liquefied petroleum gas fuel provided the complete conversion results in a truck which embodies the features specified for LP or LPS designated trucks. Such conversion equipment shall be approved. The description of the component parts of this conversion system and the recommended method of installation on specific trucks are contained in the "Listed by Report."

[39 FR 23502, June 27, 1974, as amended at 40 FR 23073, May 28, 1975; 43 FR 49749, Oct. 24, 1978; 49 FR 5322, Feb. 10, 1984; 53 FR 12122, Apr. 12, 1988; 55 FR 32015, Aug. 6, 1990; 61 FR 9227, March 7, 1996; 63 FR 66270, Dec. 1, 1998; 68 FR 32638, June 2, 2003; 71 FR 16672, April 3, 2006]

○Next Standard (1910.178 App A)

○Regulations (Standards - 29 CFR) - Table of Contents

Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  International  |  Contact Us

U.S. Department of Labor  |  Occupational Safety & Health Administration  |  200 Constitution Ave., NW, Washington, DC 20210

Telephone: 800-321-OSHA (6742)  |  TTY

www.OSHA.gov

# COMMENT

## THE CREATION OF A COMMON LAW RULE: THE FELLOW SERVANT RULE, 1837-1860

### INTRODUCTION

Searching for a comprehensive explanation of the nature of legal change is like searching for an honest man: the quest is often more illuminating than the conclusion. The quest has recently been undertaken by a new generation of legal historians who have focused upon the development of modern private law doctrines in nineteenth-century America.[1] One such doctrine, the Fellow Servant rule, presents a stark and self-contained example of common law development. This Comment examines the development of the rule to see if such an examination can clarify the interplay between competing explanations of nineteenth-century legal change.

The Fellow Servant rule was a rule of tort law created in the midnineteenth century. It carved out an exception to the well-established rule of *respondeat superior*, and relieved employers of liability for injuries negligently inflicted by any employee upon a "fellow servant." The rule did not exist until 1837, when it was first pronounced in England by Lord Abinger in *Priestley v. Fowler*.[2] In 1842 Chief Justice Lemuel Shaw of Massachusetts gave the rule its American reception and rationale in the leading case of *Farwell v. Boston & Worcester Rail Road*.[3] By 1880 the rule, in one form or another, was so firmly entrenched in nearly every American jurisdiction that late nineteenth-century treatise writers warned legislatures and courts against tampering with "a rule of the common law, based upon the wisdom and precedents of the ages."[4]

---

[1] *See, e.g.*, M. HORWITZ, THE TRANSFORMATION OF AMERICAN LAW, 1780-1860 (1977); G. WHITE, TORT LAW IN AMERICA (1980); Feinman, *The Development of the Employment at Will Rule*, 20 AM. J. LEGAL HIST. 118 (1976); Schwartz, *Tort Law and the Economy in Nineteenth-Century America: A Reinterpretation*, 90 YALE L.J. 1717 (1981).
[2] 150 Eng. Rep. 1030, 1032-33 (1837).
[3] 45 Mass. (4 Met.) 49 (1842).
[4] 1 E. WHITE, LAW OF PERSONAL INJURIES ON RAILROADS 417 (1909); *see also* M. BIGELOW, LAW OF TORTS 707 (1875). By 1854, barely 12 years after *Farwell*, the railroad attorney in the first Illinois Fellow Servant case blandly asserted that "[t]he general rule, that the master is not liable for injuries sustained by one servant through the wrongful act or negligence of another, is established by the overwhelming weight of

Commentators have used the rule to illustrate conflicting theories concerning the nature of legal development. These writers fall into two broad categories: those who view legal change largely as a function of the legal community's response to social and economic changes in society, and those who see it primarily as a response to forces within the legal community.

The clearest, and perhaps simplest, explanation is that of the economic and social determinists. They view legal development, in general, as a product of the legal system's close adaption to changes in society. To such theorists the Fellow Servant rule is an example of the general development of tort law in the direction of protecting nascent industry in an industrializing society.[5]

The major new version of this interpretation is that of Morton J. Horwitz.[6] While previous economic and social determinists depicted legal change largely as a passive response to changes in society at large, Horwitz's exhaustive study of the changes in American private law in the nineteenth-century describes a conscious effort by the legal establishment "to promote economic growth primarily through the legal . . . system."[7] To Horwitz, nineteenth-century common law judges were deliberate and conscious sources of legal change, purposefully shaping private law to accommodate the needs of their social and economic partners in the entrepreneurial classes.[8] To these "instrumentalist" judges, the private law was malleable. Their role was to mold it by discarding or reshaping ancient common law doctrines and English precedents and thereby to render the nineteenth-century legal system consonant with the social and economic needs of an industrializing

---

authority." Honner v. Illinois Cent. R.R., 15 Ill. 550 (1854) (citations omitted).

    [5] A premier advocate of the view that nineteenth-century tort law is an example of the passive response of the legal system to changes in society at large is Laurence Friedman. *See, e.g.,* L. FRIEDMAN, A HISTORY OF AMERICAN LAW 262 (1973); *see also* J. FLEMING, THE LAW OF TORTS 4-6 (1967); Friedman & Ladinsky, *Social Change and the Law of Industrial Accidents,* 67 COLUM. L. REV. 50 (1967). For an approving view of common law adaptability, see McClain, *Legal Change and Class Interests: A Review Essay on Morton Horwitz's 'The Transformation of American Law,'* 68 CALIF. L. REV. 382, 396-97 (1980) ("[t]hese changes appear to reflect the legal order's responsiveness to changed social conditions and its ability to evolve in the direction of greater flexibility, greater materiality, and, indeed, greater plain common sense").

    [6] M. HORWITZ, *supra* note 1.

    [7] *Id.* at xv.

    [8] *See id.* at 30, 253-54. As McClain notes, "[t]he Horwitz thesis is therefore one that posits orchestrated and purposive legal change." McClain, *supra* note 5, at 391-92. The theme of purposive legal change predated Horwitz. *See, e.g.,* Rabin, *Some Thoughts on Tort Law from a Sociopolitical Perspective,* 1969 WIS. L. REV. 51, 60-62 (discussing formulation of legal doctrines affecting liability for injuries from industrial accidents and defective products).

America.[9]

Central to Horwitz's thesis is a stringent periodization; Horwitz separates the early nineteenth-century period of dynamic legal change from the static eighteenth-century world which preceded it and from the late nineteenth-century era of legal formalism which followed it when the triumphant entrepreneurial classes sought to consolidate the gains they had won earlier.[10] For Horwitz, the development of the Fellow Servant rule exemplified the process by which instrumentalist judges like Lemuel Shaw molded private law in the early nineteenth century to accommodate the needs of the entrepreneurial classes.[11]

A far different perspective on nineteenth-century legal change, and on the Fellow Servant rule, is presented by those scholars who view legal development not as a reaction to social and economic change, but rather primarily as a response to intellectual forces within the legal community itself.[12] While social change may have provided the occasion

---

[9] M. HORWITZ, *supra* note 1, at 1-30; *see also* Rabin, *supra* note 8, at 56 ("The judicial concern was to allocate resources optimally in light of perceptions of the 'public' dimension of the problem; in other words, in view of the societal interest in encouraging industrial growth."). This activist, or instrumental, model of judicial activity, stripped of its nineteenth-century economic substance, has recently been cited approvingly as the appropriate model for present-day common law judges. *See* Ursin, *Judicial Creativity and Tort Law*, 49 GEO. WASH. L. REV. 229, 231, 251-59, 304-08 (1981). On the use of English precedent, see *infra* text accompanying notes 52-56. It is interesting to note that English commentators on the development of the Fellow Servant rule (the doctrine of common employment) view it not as a farsighted, if harsh, accommodation of the legal system to industrial interests, but rather as a product of backward-looking nineteenth-century judges seeking to recreate a simpler eighteenth-century world of master-servant relationships. *See* Smith, *Judges and the Lagging Law of Compensation for Personal Injuries in the Nineteenth Century*, 2 J. LEGAL HIST. 258 (1981).

[10] M. HORWITZ, *supra* note 1, at 1-30, 253-66. As Horwitz notes,

[t]he rise of legal formalism can be fully correlated with the attainment of these substantive legal changes. If a flexible, instrumental conception of law was necessary to promote the transformation of the post-revolutionary American legal system, it was no longer needed once the major beneficiaries of that transformation had obtained the bulk of their objectives. Indeed, once successful, those groups could only benefit if both the recent origins and the foundations in policy and group self-interest of all newly established legal doctrines could be disguised. There were, in short, major advantages in creating an intellectual system which gave common law rules the appearance of being self-contained, apolitical, and inexorable.
. . . .

*Id.* at 254.

For a critical view of Horwitz's periodization, see Simpson, *The Horwitz Thesis and the History of Contracts*, 46 U. CHI. L. REV. 533 (1979).

[11] *See* M. HORWITZ, *supra* note 1, at 201-04, 208-10, 253-54.

[12] *See, e.g.,* G. WHITE, *supra* note 1, at 16 (agreeing with the "conventional identification of the rise of Torts with the advent of Industrialism," but characterizing its development as "an intellectual response to the increased number of accidents involving persons who had no preexisting relationship with one another").

for legal change, they believe, it cannot provide a sufficient explanation for the direction such legal development took.[18] Thus, for example, one modern scholar, G. Edward White, has attributed the development of nineteenth-century tort law largely to "changes in jurisprudential thought."[14] In such a scheme, the intellectual force of the arguments of premier judges like Lemuel Shaw assumes major significance.[15]

When considering the role of intellectual factors in impelling legal change, it is important to remember that the intellectual process need not result in a set of legal rules that are either consistent or coherent. As Alan Watson notes, legal change can result from lawyers talking to judges talking to theorists, and the result can be at odds with any particular society's social or economic needs.[16]

[18] These scholars draw their inspiration from Roscoe Pound's conception that the "[t]enacity of a taught legal tradition is much more significant in our legal history than the economic conditions of time and place." R. POUND, THE FORMATIVE ERA OF AMERICAN LAW 82 (1938) [hereinafter cited as R. POUND, FORMATIVE ERA]. For Pound, the Fellow Servant rule was a rational judicial response to the then-current trend of judicial decisions toward limiting strict liability, rather than "something adopted wilfully in 1837 by a tribunal consciously expressing in legal doctrine the self interest of a dominant social or economic class." Pound, *The Economic Interpretation and the Law of Torts*, 53 HARV. L. REV. 365, 379 (1940); *see also id.* at 382.

[14] G. WHITE, *supra* note 1, at 3. White attributes the development of modern tort law to the efforts of nineteenth-century scholars and judges, marching under the banner of "legal science," to order and rationalize the ancient, haphazard writ system. *Id.* at 12, 14.

[15] This view is shared by L. LEVY, THE LAW OF THE COMMONWEALTH AND CHIEF JUSTICE SHAW 167 (1957). Levy believes that the sheer force of Shaw's creativity and the inescapable intellectual rigor of his argument caused American courts to follow *Farwell*. For a similar view of Shaw's influence, see Ursin, *supra* note 9, at 259-63.

[16] *See* A. WATSON, SOCIETY AND LEGAL CHANGE 8 (1977). *But see* Abel, *Law as Lag: Inertia as a Social Theory of Law* (Book Review), 80 MICH. L. REV. 785 (1982) (reviewing A. WATSON, SOCIETY AND LEGAL CHANGE (1977)); Dawson, Book Review, 49 U. CHI. L. REV. 595 (1982) (reviewing A. WATSON, THE MAKING OF CIVIL LAW (1981)); Friedman, Book Review, 6 BRIT. J.L. & SOC. 127 (1979) (reviewing A. WATSON, SOCIETY AND LEGAL CHANGE (1977)). Such criticism is beyond the scope of this Comment. As a counter to White's view of intellectual coherence, however, Watson presents an interesting counterpoint by which to test the development of a rule which was, by the end of the nineteenth century, devoid of coherence.

Also beyond the scope of this Comment is an analysis of the Fellow Servant rule in the light of the well-known economic efficiency theories development by Richard Posner and his followers. *See, e.g.,* Posner, *A Theory of Negligence,* 1 J. LEGAL STUD. 29 (1972); Posner, *Change in the Common Law: Legal and Economic Perspectives,* 9 J. LEGAL STUD. 189 (1980) [hereinafter cited as Posner, *Change in the Common Law*]. Posner views nineteenth-century judges as following the "invisible hand" of economic efficiency whether consciously or not. They thereby created a tort law which maximized the efficient allocation of resources in an industrializing society. Posner's view focuses heavily on a retrospective analysis of rules like the Fellow Servant rule. *See generally* Posner, *Change in the Common Law, supra.* This Comment, however, focuses not on the economic effects of the rule, but rather upon the process by which it was created. Posner's analysis is not, therefore, particularly relevant to the questions posed here.

This Comment examines the sufficiency of these views to account for the development of the Fellow Servant rule. It traces the migration of the rule through various jurisdictions through a study of cases of first impression. Such cases are excellent vehicles for examining the migration of any doctrine, for in adopting or rejecting any particular rule, judges feel a particular burden of explanation.[17]

Part I of the Comment discusses the English and American cases that established the Fellow Servant rule. This section suggests that these cases were followed by subsequent courts at least in part because of intellectual forces within the legal community. The Comment argues that among the intellectual forces shaping the rule was the continuing eighteenth-century myth that the role of judges was to "discover" rather than to make the rules of the common law. Once correctly discovered, these judges believed, such rules must be strictly adhered to by subsequent courts.[18]

Part II examines those jurisdictions that resisted the Fellow Servant rule by creating exceptions to it. It suggests that common law judges chose to resist the rule by creating exceptions to it rather than by rejecting it outright, and that their choice was shaped primarily by contemporary legal norms.

The Comment concludes that no explanation of the development of the Fellow Servant rule can be complete without acknowledging the role played by economic developments. The rule developed in an industrial context, and Fellow Servant problems came before the courts because the machines of a rapidly industrializing society were maiming ever-growing numbers of employees.[19] Moreover, the response of judges like Shaw, when faced with Fellow Servant cases, was undoubtedly influenced by the consequences that they recognized their decision would have for the economic and social developments they wished to foster.[20]

Such an explanation, however, while necessary, is not sufficient to explain the development of the Fellow Servant rule as it traveled through the American jurisdictions. By the late nineteenth century, the rule varied from state to state; its hallmark was not consistent subsidization of economic growth, but rather incoherence and inconsistency.[21]

---

[17] *See, e.g.,* Coon v. Syracuse & U.R.R., 6 Barb. 231, 236 (1849), *aff'd,* 5 N.Y. 492 (1851).

[18] *See infra* notes 102-06 and accompanying text.

[19] *See* Friedman & Ladinsky, *supra* note 5, at 60.

[20] *See* L. LEVY, *supra* note 15, at 178-79; C. WARREN, A HISTORY OF THE AMERICAN BAR 486 (1911).

[21] The Fellow Servant rule, in many jurisdictions, had developed into such a maze of conflicting rules, exceptions, and qualifications that no lawyer could confidently advise a client as to the exact state of his liability. *See infra* notes 148-224 and accompa-

These developments, the Comment concludes, cannot be explained as a judicial response to economic needs within society at large, but were dependent far more on intellectual imperatives within the legal community. Many of Shaw's colleagues on the early nineteenth-century bench were not instrumentalists. Because they framed their responses to the rule within the constraints imposed by prevailing legal norms and techniques, they developed rules for their jurisdictions that produced short-term legal harmony at the expense of long-term legal coherence.

## I.  THE DEVELOPMENT OF THE RULE

### A.  Priestley v. Fowler, *and its Influence upon American Courts*

It is not strange that economic determinists detected a conspiracy to aid the industrial classes in the Fellow Servant rule because the law out of which the rule developed had definitively imposed liability on a master for the consequences of a servant's negligence. In the eighteenth century, the rule of *respondeat superior* was extremely broad and firmly entrenched. As one of the earliest compilations of American law restated the rule: "the master is responsible for the acts of his servant, if done by his command, expressly or impliedly given."[22] There were few exceptions to the rule, noted one treatise writer, for the law imposed upon the master the absolute duty to "employ servants who [were] skilful and careful."[23]

This broad principle could have covered the situation in which an employee negligently inflicted an injury, not upon a stranger, but upon a fellow employee.[24] In France the high court of appeal did rule that *respondeat superior* was the principle applicable to Fellow Servant sit-

---

nying text. Treatise writers worried about the "extraordinary diversity of judicial opinion . . . without a parallel in any department of jurisprudence." 4 C. LABATT, MASTER AND SERVANT 4143 (2d ed. 1913). Another noted, "He must be a bold man who would undertake to tell where the doctrine of common employment [the Fellow Servant rule] ends, and that of the master's duty . . . begins in any State in the Union." Shirley, *The Future of Our Profession*, 17 AM. L. REV. 645, 662 (1883). The litigation on the subject was enormous and the economic benefit of the rule to any class in society, except possibly the lawyers, was doubtful. In a widely used digest at the turn of the century, for example, the cases on a master's liability for injuries caused by negligent fellow servants consumed 750 pages. *See* 34 AM. DIG. 839-1588 (Century ed. 1902).

[22] 2 N. DANE, GENERAL ABRIDGMENT AND DIGEST OF AMERICAN LAW 494 (1823); *see also* T. REEVE, THE LAW OF BARON AND FEMME, OF PARENT AND CHILD, GUARDIAN AND WARD, MASTER AND SERVANT AND OF THE POWERS OF COURTS OF CHANCERY 357-58 (2d ed. 1846); J. STORY, COMMENTARIES ON THE LAW OF AGENCY § 452 (1839). The rule, in fact, was a prime example of liability arising out of predetermined status relationships, or contract, which was a characteristic of 18th century law. *Cf.* M. HORWITZ, *supra* note 1, at 207-08.

[23] T. REEVE, *supra* note 22, at 358.

[24] *See* Friedman & Ladinsky, *supra* note 5, at 52-53.

uations,[25] and the United States Supreme Court came close to the same result in *Philadelphia & Reading Railroad v. Derby*.[26]

The plaintiff in *Derby* was a stockholder of the defendant railroad company who was injured by the negligent conduct of the train engineer while riding on an official company tour. One argument advanced by the defendants was that the master is not liable for injury inflicted negligently by one servant upon another.[27] The Court stated, however, that the cases cited by defendants "[have] no application to the present."[28] "[T]he maxim of *'respondeat superior,'* which, by legal imputation, makes the master liable for the acts of his servant, is wholly irrespective of any contract, express or implied, or any other relation between the injured party and the master."[29]

Nevertheless, by the end of the eighteenth century, English and American courts had begun to set some limits to a master's liability for his servant's negligence, especially in those situations where the master actually exercised little control over the servant's behavior. He would not be held liable, for example, for a servant's willful, as opposed to negligent, wrong.[30] Similarly, there were limits placed upon the extent of a shipowner's liability for the captain's negligence. Both limitations had as their rationale the protection of the master/servant relationship.

---

[25] The *respondeat* provision of the French Civil Code is the broadly phrased Article 1384. CODE CIVIL ART. 1384. The *Cour de cassation*, the high court of appeal, held in 1841 that *respondeat* definitely covered negligent injuries inflicted by one servant upon another, and rejected all argument that the master's liability under the law could be mitigated by a servant's "assumption of risk" implied in his rate of wages. *See* Reygasse v. Plaxon, June 28, 1841, Cour de cassation, 1841 Recueil Periodique et Critique [D.P.] I 275. It is interesting to note that the case arose out of a domestic situation similar to that in Priestley v. Fowler, 150 Eng. Rep. 1030 (1937). In *Reygasse* the injury occurred when two gardeners were trimming a hedge. *See infra* notes 33-49 and accompanying text.

[26] 55 U.S. 467, 14 How. 468 (1852).

[27] *Id.* at 484. For this proposition the defendants cited Farwell v. Boston & W.R.R., 45 Mass. (4 Met.) 49 (1842). *Id.*

[28] 55 U.S. at 484, 14 How. at 484.

[29] 55 U.S. at 484, 14 How. at 485. In using such broad language the Court did not, however, state that the particular facts of the case before it presented a Fellow Servant situation, and thus did not expressly hold that *respondeat* was the principle applicable to such situations. The Court did state, however, that *respondeat* was applicable to the following situations:

> If one be lawfully on the street or highway, and another's servant carelessly drives a stage or carriage against him, and injures his property or person, it is no answer to an action against the master for such injury, either, that the plaintiff was riding for pleasure, or that he was a stockholder in the road, or that he had not paid his toll, or that he was the guest of the defendant, or riding in a carriage borrowed from him, or that the defendant was the friend, benefactor, or brother of the plaintiff.

55 U.S. at 484-85, 14 How. at 485.

[30] *See* 2 N. DANE, *supra* note 22, at 494-95.

The law could not, courts held, "allow to servants a power to ruin their masters."[81]

A similar spirit animated Lord Abinger, sitting in the Court of Exchequer, when in 1837, he announced the court's decision in *Priestley v. Fowler*,[82] the case which first enunciated the Fellow Servant rule.[83] *Priestley* was an unlikely case to carry its heavy precedential burden. Fowler, a butcher, ordered his assistant Priestley to make deliveries in an overloaded van driven by another assistant. The van capsized, fracturing Priestley's leg. He sued his master for damages, won, and the master appealed.[84]

Lord Abinger's opinion is scarcely a model of judicial clarity or authority.[85] He began by making the questionable decision to treat the case as one of first impression, which he was "therefore to decide . . . upon general principles."[86]

One general principle relied upon by Abinger was assumption of risk. During the argument at court, Abinger stated that "[t]he plaintiff was not bound to go by an overloaded van; he consents to take the risk."[87] In his opinion for the court, he stated that "the plaintiff must have known as well as his master, and probably better" about the dangerous condition of the van.[88] He noted that "[t]he servant is not bound to risk his safety in the service of his master and may, if he thinks fit, decline any service in which he reasonably apprehends injury to

---

[81] *Id.* at 495. The eighteenth-century master/servant relationship was one based upon status and social ties rather than on economics. *See* M. GLENDON, THE NEW FAMILY AND THE NEW PROPERTY 146-47 (1981).

[82] 150 Eng. Rep. 1030, 1032 (1837).

[83] *See* Friedman & Ladinsky, *supra* note 5, at 54; Smith, *supra* note 9, at 259. *But see* Ingman, *The Rise and Fall of the Doctrine of Common Employment*, 1978 JURID. REV. 106 (claiming that the doctrine of common employment must be traced not to *Priestley*, but to subsequent cases which misread *Priestley*).

[84] 150 Eng. Rep. at 1030-31.

[85] One authority considers much of the reasoning in the case to have been "far fetched" and cites it as a prime example of an incorrectly decided case. *See* R. CROSS, PRECEDENT IN ENGLISH LAW 191-92 (2d ed. 1968); *see also* Ingman *supra* note 33, at 108-10.

[86] 150 Eng. Rep. at 1032. Ingman notes that the case could easily have been decided by reference to cases on the ill-treatment of apprentices, health and welfare of servants, or working condition of seamen. *See* Ingman *supra* note 33, at 109. The plaintiff's lawyer, in fact, argued the case strictly in terms of *respondeat*. *See* 150 Eng. Rep. at 1031.

[87] 150 Eng. Rep. at 1031.

[88] *Id.* at 1033. During argument Abinger had stated that "[i]t does not appear on the face of the declaration, that the plaintiff knew the van was overloaded, and it cannot be intended after verdict: on the other hand, it does not appear that the defendant knew it." *Id.* at 1031. The report of the case, however, notes that the plaintiff had given evidence at trial that the van had "been overloaded with the defendant's knowledge." *Id.*

himself."[39]

Abinger also rested his decision upon general principles of public policy. He stated that a servant had a duty to exercise "diligence and caution" to protect himself from the negligence of a fellow servant, and that allowing the plaintiff to recover would discourage the exercise of that caution.[40] He concluded that "diligence and caution . . . are a much better security against any injury the servant may sustain by the negligence of others engaged under the same master, than any recourse against his master for damages could possibly afford."[41]

Perhaps the true basis of Lord Abinger's opinion lies in his "parade of horrors"—the consequences he feared would ensue from holding the master liable. Should Priestley recover, he warned, "the principle of that liability will be found to carry us to an alarming extent."[42] He predicted,

> The master, for example, would be liable to the servant for the negligence of the chambermaid, for putting him into a damp bed; for that of the upholsterer, for sending in a crazy bedstead, whereby he was made to fall down while asleep and injure himself; for the negligence of the cook, in not properly cleaning the copper vessels used in the kitchen; of the butcher, in supplying the family with meat of a quality injurious to the health; of the builder, for a defect in the foundation of the house, whereby it fell, and injured both the master and the servant by the ruins.[43]

*Priestley*, as Abinger's feared consequences demonstrate, grew out of a desire to preserve the eighteenth-century master/servant relationship.[44] It decided no more than that an employee was considered to have assumed the risks of which he was aware, or that were obvious. As an English commentator noted, there was no need to extend the case into the industrial context, nor to read it as creating a broad rule exempting all employers from liability for negligent injuries among coworkers.[45] Nevertheless, American courts gave *Priestley* this broad

---

[39] *Id.* at 1032-33; *see also* Ingman, *supra* note 33, at 110 ("*Priestley v. Fowler* decided that an employee, on taking employment, is deemed voluntarily to have accepted the risks incidental to the work and of which he is aware or which are obvious.").

[40] 150 Eng. Rep. at 1033.

[41] *Id.*

[42] *Id.* at 1032.

[43] *Id.*

[44] *See supra* note 31.

[45] Ingman, *supra* note 33, at 110. Smith regards the decision as "appropriate to a simple pre-industrial society." Smith, *supra* note 9, at 259. Ingman notes that the ex-

reading.

Although the industrial contexts of most American cases did not provide good factual analogies to *Priestley's* master/servant situation,[46] *Priestley* was continually cited in America for the broad proposition that an employer should not be liable for negligent injuries inflicted by one of his employees upon another.[47] Even those judges who struggled to narrow the rule's application felt compelled to explain at length why *Priestley's* rationale did not cover the case before the court, rather than simply distinguishing the case on its facts, or dismissing it as unauthoritative "foreign" authority.[48] What, then, explains the continuing disposition of American courts to acknowledge the authority of this recent English decision?

One explanation has been given by Friedman and Ladinsky. *Priestley*, in their view, remained authoritative simply because its principle of restricting an employer's liability filled a need in an industrializing America: "Had there been no *Priestley v. Fowler*, it would have been necessary—and hardly difficult—to invent one."[49]

An alternative explanation, which accords better with what courts did, rather than what they might have done, recognizes the continuing authority of English precedent in mid-nineteenth-century American courts. This explanation, however, conflicts with one central proposition of the Horwitz thesis. For Horwitz, the transformation of American law depended upon a rejection by instrumentalist judges of the constraints of English form and authority and an acceptance instead of a style of judicial reasoning which was "derived from a new conception of common law as a self-conscious instrument of social policy."[50] For evi-

tension of the *Priestley* rule to cover negligence of fellow servants in an industrial context did not come about in England until 1850, in Hutchinson v. York, N. & B. Ry., 155 Eng. Rep. 150 (1850). *See* Ingman, *supra* note 3, at 114. In *Hutchinson* the rule was broadly stated (and imputed to *Priestley*) that a servant "when he engages to serve a master, undertakes . . . to run all the ordinary risks of the service, and this includes the risk of negligence on the part of a fellow-servant." *Hutchinson,* 155 Eng. Rep. at 154. This explanation will not account for the authority *Priestley* had in America, however, where it was cited to support the broad Fellow Servant principle both before and after 1850. *See, e.g.,* Scudder v. Woodbridge, 1 Ga. 195, 198 (1846); Coon v. Syracuse & U.R.R., 6 Barb. 231, 235 (1849), *aff'd,* 5 N.Y. 492 (1851); Ponton v. Wilmington & W.R.R., 51 N.C. (6 Jones) 245, 246 (1858); Ryan v. Cumberland Valley R.R., 23 Pa. 384, 386 (1854).

[46] It has been argued that *Priestley* was also inappropriate to rapidly industrializing mid-nineteenth century Britain. *See* Smith, *supra* note 9, at 259.

[47] *See, e.g.,* Coon v. Syracuse & U.R.R., 5 N.Y. 492, 494 (1851); Ryan v. Cumberland Valley R.R., 23 Pa. 384, 386 (1854).

[48] *See, e.g.,* Gillenwater v. Madison & I.R.R., 5 Ind. 339, 343-44 (1854).

[49] Friedman & Ladinsky, *supra* note 5, at 55.

[50] M. HORWITZ, *supra* note 1, at 25. *See id.* at 22-26; *see also* Nelson, *The Impact of the Antislavery Movement upon Styles of Judicial Reasoning in Nineteenth*

dence, Horwitz relied on state statutes forbidding the continued citation of recent English cases and on statements by American scholars that much of English common law was "as inapplicable to [American] concerns as the laws of Germany or Spain."[61]

In fact, such evidence may prove only that the fears of those jurists who wished to free American law from common law constraints were well grounded. American lawyers, despite the best efforts of these reformers, remained wedded to the English sources of authority that their training had taught them to revere.[62] As the Philadelphia lawyer Charles Ingersoll complained, "American lawyers and judges adhere with professional tenacity to the laws of the Mother Country." "Recent English adjudications," he noted, were "received with a respect, too much bordering on submission." He deplored the "professional bigotry" which led to the acceptance of these authorities "without probation or fitness."[63]

This continuing hold of English authority is not surprising. The apprenticeship training of most American lawyers practicing in the early nineteenth century depended heavily upon an almost ritual reading of English authorities;[64] English opinions were the standard by which lawyers judged the products of American courts,[65] and the professional conduct of the English bench and bar was held up as the model for the profession.[66]

The continuing weight given precedents of authoritative English

*Century America*, 87 HARV. L. REV. 513, 514 (1974). *See generally* Scheiber, *Instrumentalism and Property Rights: A Reconsideration of American 'Styles of Judicial Reasoning' in the 19th Century*, 1975 WIS. L. REV. 1, 4.

[61] 1 N. DANE, *supra* note 22, at v; *see* M. HORWITZ, *supra* 1, at 1-30.

[62] This was precisely what Scheiber found regarding American riparian law: "[f]ar from rejecting common-law precedents out of hand, American judges felt constrained to cast emergent riparian law in the traditional framework." *See* Scheiber, *supra* note 50, at 5. These judges, he notes, "often bent far to adopt outright—or at least to acknowledge the basic validity of 'ancient English . . . authorities.'" *See id.* (footnote omitted); *see also* L. FRIEDMAN, *supra* note 5, at 285.

[63] C. INGERSOLL, A DISCOURSE CONCERNING THE INFLUENCE OF AMERICA ON THE MIND (1823), *cited in* C. WARREN, *supra* note 20, at 509; *see also* Shirley, *supra* note 21, at 658 ("Our courts constantly turn to the reports of the mother country and her dependencies."); *Law Reform-Practice*, 12 MONTHLY L. REP. (n.s. No. 2) 61, 71 (1849).

[64] *See* 2 A. CHROUST, THE RISE OF THE LEGAL PROFESSION IN AMERICA 175-76, 288 (1965).

[65] *Cf., e.g.*, Story, *Progress of Jurisprudence, An Address Delivered Before the Members of the Suffolk Bar* (1821), in THE MISCELLANEOUS WRITINGS OF JOSEPH STORY 198, 233 (W. Story ed. 1852) ("[E]xemplifications of our judgments may pass . . . to England; and it ought to be our pride to know, that they will not be disgraced under the inspection of the sober benchers of any Inn of Court.").

[66] *See, e.g.*, *The Bench and Bar in England*, 12 MONTHLY L. REP. (n.s. No. 2) 217, 223 (1849).

courts had an important influence on the development of the Fellow Servant rule in America. Beginning with almost the first case, defendants' counsel cited *Priestley's* holding as persuasive authority for the proposition that a master was not liable in damages to his servant for injuries caused by a fellow servant.[57] American courts disposed to reject the Fellow Servant rule could do so only by rejecting or lessening the force of a decision of the English Court of Exchequer.[58]

## B. Farwell v. Boston & Worcester Rail Road: *Establishing the Rule in America*

The first American cases to adopt the Fellow Servant rule were *Murray v. South Carolina Railroad*[59] and *Farwell v. Boston & Worcester Rail Road*.[60] Both cases involved railroad accidents, which would come to be the typical Fellow Servant context.[61] Both cases squarely held that masters would not be held liable for negligent injuries inflicted by one employee upon another. Yet *Farwell* is regarded by most authorities as the case which established the Fellow Servant rule in America.[62] *Murray*, decided four years before *Farwell*, faded quickly into relative obscurity. *Murray*, a divided opinion, weakly reasoned, from a little-regarded state court, epitomized the type of case authority

---

[57] *See, e.g.,* Scudder v. Woodbridge, 1 Ga. 195, 196 (1846); Farwell v. Boston & W.R.R., 45 Mass. (4 Met.) 49, 54 (1842).

[58] One way to do so was to counter the weight of *Priestley* with authority from another common law jurisdiction, Scotland. In Dixon v. Rankin, 1852 Sess. Cas., 14 D. 420, the Scots Court of Sessions decisively rejected the *Priestley* doctrine. "If this be the law of England . . . ," held Lord Cockburn, "it most certainly is not the law of Scotland." He was glad of it, he observed, because he had "rarely come upon any principle that seem[ed] less reconcileable to general legal reason." If servants did assume any risk, they did so on the master's account, and in justice the master should be liable for harm. 14 D. at 426.

Dixon was reprinted in America in one of the first specialized unofficial reporters. *See* 1 AM. R.R. CASES 569 (1852). The reasoning was cited by American authorities to counter *Priestley's* weight, although the case was not followed. *See, e.g.,* Bassett v. Norwich & W.R.R., 19 MONTHLY L. REP. (n.s. No. 9) 551 (1857); Cleveland, C. & C.R.R. v. Keary, 3 Ohio St. 201, 213 (1854).

[59] 26 S.C.L. (1 McMul.) 385 (1838).

[60] 45 Mass. (4 Met.) 49 (1842).

[61] The Fellow Servant rule was not necessarily limited to railroad accidents. *See, e.g.,* Albro v. Agawam Canal Co., 60 Mass. (6 Cush.) 75, 77 (1850) (*Farwell* cited as governing authority for absolving the owner of a cotton mill from liability). Nevertheless, most cases of first impression arose in a railroad context, and the rule itself was considered, at least by many treatise writers, as a part of railroad law. *See* I. REDFIELD, A PRACTICAL TREATISE UPON THE LAW OF RAILWAYS 386-92 (2d ed. 1858); H. PIERCE, A TREATISE ON AMERICAN RAILROAD LAW 286-310 (1857); *see also* Friedman & Ladinsky, *supra* note 5, at 60. Because one can trace the rule's development solely within the railroad context, the wider application of the rule is beyond the scope of this Comment.

[62] *See, e.g.,* C. WARREN, *supra* note 20, at 485; L. LEVY, *supra* note 15, at 167.

nineteenth-century courts, were least disposed to follow.[63] *Farwell* was just the opposite.

*Farwell*[64] came before Chief Justice Lemuel Shaw of the Supreme Judicial Court of Massachusetts in March 1842.[65] The facts presented a sympathetic case for the plaintiff. Farwell was an engineer on the new Boston & Worcester. While the engineer was driving his engine with all due care, the train jumped the track because a depot employee had neglected to throw the appropriate switch. Farwell was "thrown with great violence upon the ground" and his right hand was crushed under the passing railroad car.[66]

Counsel for both plaintiff and defendants presented a narrow case to Shaw for decision. Plaintiff's counsel conceded that *respondeat* did not cover the case, and that *Priestley*, which had been "rightly decided," was the relevant precedent.[67] He believed, however, that his client's case must be distinguished because an engineer and a switch tender did not share a "common purpose," and therefore could not be considered to be "fellow servants."[68] Defendants' counsel, predictably,

---

[63] *See infra* notes 106-10 & 141-46 and accompanying text. The first American plaintiff to be confronted by the Fellow Servant rule was James Murray, a former tailor of "intemperate habits" who had taken work as a fireman on one of South Carolina's first steam railroads. *Murray*, 26 S.C.L. (1 McMul.) at 385. When the engineer negligently ran the train into a horse, Murray's leg was crushed between the engine and tender. The factual situation was confused, however, and it was not clear whether Murray's injury had resulted from a fellow servant's negligence. *See id.* at 402 (O'Neall, J., dissenting).

The court divided, 7-3. The majority opinion is a model of judicial hesitation and timidity. The court relied heavily on the fact that there was no precedent for holding an employer liable. Although the railroad's liability to its passengers as a common carrier was clear, the court refused to extend liability to the railroad, as employer, "without a single case or precedent to sustain it." 26 S.C.L. (1 McMul.) at 400. The court ended on a tentative note, issuing an invitation to subsequent courts to narrow *Murray's* holding to the facts of the case. It was "not intended," the court observed, "to prejudge other questions, which may arise between the company and its servants," nor did it consider *Murray* to settle the question in future cases of "whether an individual or company will be liable for the acts of one agent to another." *Id.* at 401.

The tentative nature of the majority contrasted sharply with the two strong dissents, which agreed that *respondeat* fully covered the case. Surely, one dissenting justice observed, no one would "presume" to "contend that the rule applicable *to service* in a rail road company, is, that the company is not liable to *any* agent, for *any* injury, provided the company can only shew that another of its agents has inflicted it." *Id.* at 408 (Johnston, J., dissenting). In fact, within one year of *Murray*, Chief Justice Shaw of Massachusetts "presumed" to contend for a rule precisely this broad. Compare the authoritative nature of Shaw's *Farwell* opinion, *infra* text accompanying notes 109-14.

[64] 45 Mass. (4 Met.) 49 (1842).

[65] On Shaw himself, see the excellent biography by L. LEVY, *supra* note 15.

[66] 45 Mass. (4 Met.) at 50.

[67] *Id.* at 52.

[68] 45 Mass. (4 Met.) at 51 (plaintiff's argument). One might argue that it was an inexcusable tactical error for plaintiff's counsel, Loring, to have conceded that *respondeat* was not applicable. Horwitz, in fact, labeled Loring's concession as "astonishing."

argued that *Murray* and *Priestley* precisely covered the case, but that, in any event, it would "not be necessary for the court to lay down a general rule, in order to decide this case for the defendants."[69]

The arguments of counsel are particularly interesting because they demonstrate clearly the narrow way in which *Farwell* might have been decided by a judge other than Shaw. They epitomize the model of decision in fact followed in later Fellow Servant cases.[70]

Shaw, however, viewed the case in a much broader light and self-consciously laid out and justified a general rule for regulating a master's liability for negligent injuries inflicted by employees upon their co-workers. He framed the question for decision in the broadest possible terms. "The question is," he noted, "whether, for damages sustained by one of [a railroad's employees] by means of the carelessness and negligence of another, the party injured has a remedy against the common employer."[71]

Shaw's *Farwell* opinion is well known and his reasoning has been extensively analyzed.[72] He simply brushed away any suggestion that the case could be decided by extending *respondeat*, with a grateful nod to plaintiff's counsel for conceding the point,[73] and proceeded to justify his rule on the intertwined theories of implied contract and assumption of risk. When a servant voluntarily accepts employment, Shaw concluded, he assumes all risks "incident" to his employment, among which must be included the risk of "carelessness and negligence of those who are in the same employment."[74] Such a rule best ensures industrial safety, Shaw reasoned, for it gives employees, who are in the best position to observe and guard against their co-workers' negligence, the incentive to do so.[75]

A striking aspect of *Farwell*, to a modern observer, is its self-consciousness. Shaw was acutely aware that he was creating law. He stated his conclusions broadly, and dismissed any attempts to narrow

---

M. HORWITZ, *supra* note 1, at 210. While the concession made Shaw's opinion easier to write, Loring was only following a perfectly acceptable model of lawyering, that is, conceding the general point, and attempting to distinguish his client's case. Such tactics were in no small measure responsible for the rapid spread of the Fellow Servant rule. *See infra* text accompanying notes 217-22.

[69] 45 Mass. (4 Met.) at 54 (defendant's argument).

[70] *See infra* text accompanying notes 120-224.

[71] 45 Mass. (4 Met.) at 55.

[72] *See, e.g.*, L. FRIEDMAN, *supra* note 5, at 263-64, 414; M. HORWITZ, *supra* note 1, at 209-10; R. POUND, *supra* note 13, at 87.

[73] 45 Mass. (4 Met.) at 56.

[74] *Id.* at 57.

[75] *Id.* at 59; *cf. Priestley*, 150 Eng. Rep. at 1033 ("To allow this sort of action to prevail would be an encouragement to the servant to omit that diligence and caution which he is in duty bound to exercise on the behalf of his master . . . .").

his rule as "supposed distinctions" on which "it would be extremely difficult to establish a practical rule."[76] This self-consciousness is apparent in Shaw's cavalier reference to the only precedents which existed, *Priestley* and *Murray*.[77] In contrast to his elaborate exposition of his assumption of risk and implied contract theories, Shaw simply observed that the "authorities, as far as they go," supported his position.[78]

The premises upon which *Farwell* rested reflected accurately the precarious reality of the early railroads. While recent scholarship has cast doubt on the key role of railroads in fueling nineteenth-century economic growth,[79] there is little doubt that contemporaries enthusiastically supported the new mode of transportation as a boon to enterprise. The economic position of the early railroads, however, was uncertain; railroad supporters worried about the ability of the roads to surmount the twin obstacles of uncertain financing and a rudimentary technology.[80] A recent study of the early years of the Boston & Worcester Railroad, the defendant in *Farwell*, graphically depicts the realities of the early railroads. The trains ran along a single track, with no signals, and, initially, no way of warning scheduled passenger trains of the presence of repair trains on the track.[81] The directors attempted to minimize the danger through a system of rigid scheduling and elaborate safety rules, the necessity to obey which was pressed upon the employees.[82] The wages paid employees charged with the responsibility of enforcing these rules were considerably higher than those paid to lower level employees.[83]

The entrepreneurs who owned the railroads, then, were interested in reducing safety hazards as well as in turning a profit.[84] Shaw responded well to their concerns when in *Farwell* he relieved the rail-

---

[76] 45 Mass. (4 Met.) at 60.

[77] Although he referred to *Priestley* in a slighting manner, Shaw nonetheless rested his decision on the same assumption of risk argument used by Lord Abinger. *See supra* notes 73-74 and accompanying text.

[78] 45 Mass. (4 Met.) at 57.

[79] *See, e.g.*, R. FOGEL, RAILROADS AND AMERICAN ECONOMIC GROWTH: ESSAYS IN ECONOMETRIC HISTORY 15 (1964).

[80] *See, e.g.*, S. SALSBURY, THE STATE, THE INVESTOR, AND THE RAILROAD: THE BOSTON & ALBANY, 1825-1867, at 81-82 (1967).

[81] "Miraculously, however, no scheduled train ever collided with another during the early years. The railroad's wrecks all involved an unscheduled repair train, which emerged as the system's Jonah." *Id.* at 115.

[82] *Id.* at 113-19. *See generally* A. CHANDLER, JR., STRATEGY AND STRUCTURE: CHAPTERS IN THE HISTORY OF THE INDUSTRIAL ENTERPRISE 21-23, 38 (1962).

[83] *See* S. SALSBURY, *supra* note 80, at 359 n.7. Conductors, who ran the trains, received $600 yearly; engineers, who drove them, received $2 per day; and firemen and brakemen received $1 respectively.

[84] The Boston & Worcester's board of directors had created a rate structure which they had originally hoped would produce a six per cent annual dividend. *Id.* at 123.

roads of potentially massive liability for Fellow Servant injuries and thereby placed the burden of avoiding accidents on the employees who were already paid to prevent them.

Shaw, then, by attending so well to the needs of the entrepreneurial classes,[65] is the very model of Horwitz's instrumentalist judge. Because many of his contemporaries on the American bench and bar were motivated by far different imperatives, however, they simply followed *Farwell* as precedent, rather than emulating Shaw's style and examining his premises.

### C.  *Following* Farwell: *Jurisprudence by Discovery*

With the spectacular growth of railroads in the 1840's[66] came the predictable rash of railroad accidents. One American jurisdiction after another faced the question whether to adopt the Fellow Servant rule. Many recognized that it was "a question of very great importance, from the frequency with which accidents of that kind are liable to happen upon the numerous railroads of the state."[67] Most courts decided to follow *Priestley* and *Farwell* and broadly adopt the rule.

New York was typical. A lower court had declined an opportunity to adopt the rule in 1844[68] and the question did not reach an appellate court until 1849 in *Coon v. Syracuse & Utica Rail-Road.*[69] The plain-

---

[65] C. WARREN, *supra* note 20, at 449. Warren observed that Shaw had been "largely influenced by economic conditions and the need of favoring the young and struggling institution of railroads."

There is an intriguing question of just how personally Shaw was acquainted with the Boston & Worcester. In his papers is a letter dated February 28, 1842 from George Bliss, founder, director, and newly elected president of the railroad. Bliss invited Shaw and "other members of the Supreme Court" to accompany the company's directors and executive officers on "an excursion to Springfield on Friday the 4th . . . to meet the public authorities of N. York including their Judiciary." With the letter is a ticket, made out "For Chief Justice Shaw" for a return fare, Boston to Albany, on March 4, 1842. There is no indication whether Shaw made the trip. *Farwell* was decided at the March 1842 term. *See* Letter from George Bliss to Lemuel Shaw (Feb. 28, 1842) (Lemuel Shaw Papers, Reel XII, No. 762, Univ. of Va. Library). On Bliss, *see* S. SALSBURY, *supra* note 80 at 182.

[66] Between 1830 and 1848, there was a total of 5,205 miles of track built in the United States. Between 1849 and 1860, 30,135 miles were built. *See* C. WARREN, *supra* note 20, at 479.

[67] Coon v. Syracuse & U.R.R., 6 Barb. 231, 236 (1849), *aff'd*, 5 N.Y. 492 (1851).

[68] In Brown v. Maxwell, 6 Hill 592, 594-95 (N.Y. Sup. Ct. 1844) the court referred to the "recently adjudged" *Farwell* decision which, though "thoroughly examined and considered" and of which the court entertained "no doubt of [the] correctness," was not necessary to a decision of the instant case, which was decided on a theory of contributory negligence.

[69] 6 Barb. 231 (1849). *Coon*, decided in an appellate division of the Supreme Court (New York's lower court) will be considered the case of first impression in New

tiff, a track repairman operating a hand car, was "run over" by a repair train.[90] While the case presented questions of contributory negligence,[91] the court ignored them and rested its opinion squarely on *Priestley* and *Farwell*, in which "the subject . . . would seem to be exhausted." "[I]t would be presumption in me," Judge Pratt wrote, "to attempt to add anything to the force of those decisions, by way of argument or illustration."[92] His opinion closely followed Shaw's implied contract theory, and adverted to Lord Abinger's examples in discussing the policy consequences of a contrary rule.[93] *Coon* is striking, and typical, in the unqualified manner in which it adopts the Fellow Servant rule. On the authority of *Farwell*, Pratt simply dismissed any possible limitations on the rule.[94] The New York Fellow Servant rule, therefore, came close to exempting employers from all liability for industrial accidents caused by an employee's negligence.

Other jurisdictions emulated the New York approach; some opinions did no more than observe that the question was a new one in the state, that "the whole argument upon the question is embodied in the opinion of Chief Justice Shaw," and that therefore the rule must be

___

York. The presiding judge, Pratt, treated it as such, and was explicit about his reasons for adopting the broad Fellow Servant rule. Pratt was strongly reaffirmed by the New York Court of Appeals, in a two-page opinion, in which two justices, Gardiner and Foot, held that the lower court had rightly followed *Farwell*. *See* 5 N.Y. 492, 495 (1851) (Gardiner, J.) ("The case before us cannot be distinguished from that in Metcalf. To the elaborate opinion of chief justice SHAW, nothing can be added without danter of impairing the force of his reasoning."). The separate opinion of Justice Foot was even blunter:

> Was [sic] this principle sought to be applied for the first time in the present action, I should deem it my duty, not only to examine it in all its bearings, test its soundness by all the means at my command, and endeavor to reach a correct conclusion, but also to assign in full my reasons. This duty has, however, been already performed, ably and learnedly, by three eminent judicial tribunals: viz, the court of exchequer in England [*Priestley*], the court of appeals of South Carolina [*Murray*], and the supreme court of Massachusetts [*Farwell*] [citations omitted]. They all concur in sanctioning the principle, and I fully acquiesce in their judgment . . . . It must now be considered as settled, and hereafter to form a part of the common law of the country.

*Id.* at 496. So, in fact, it was treated in the next Fellow Servant case to reach the Court of Appeals. *See* Keegan v. Western R.R., 8 N.Y. 175, 180 (1853).
[90] 6 Barb. at 231.
[91] Counsel for the defendants argued that plaintiff had a "duty to carry a light, so that . . . he might be seen by the engineers." *Id.* at 235. The court agreed: "The evidence . . . shows quite clearly that the plaintiff was himself guilty of negligence . . . ." *Id.*
[92] *Id.* at 236.
[93] *Id.* at 239-40.
[94] *Id.* at 241, 242-43. Thus, for example, Pratt turned aside arguments which would have created exceptions in the case of negligent superiors or workers in different departments. On these exceptions, see *infra* text accompanying notes 148-204.

adopted.[95] As more jurisdictions followed this pattern, the string citations following the adoption of the rule became longer.[96]

Some scholars have simply correlated the adoption of the broad
rule in so many jurisdictions with the contemporaneous rapid expansion of railroads.[97] The two phenomena undoubtedly coincided.[98] It is
also true that railroad accidents provided the factual context for most
Fellow Servant cases.[99]

Any such explanation, however, standing alone, is insufficient.
Some jurisdictions that followed the rule were highly developed railroad states, but others were not. Moreover, some jurisdictions that
struggled against the rule had a heavy concentration of railroads.[100]
While it would be wrong to ignore the role played by railroads in providing both the occasion, and, in some instances, the impetus for judges
to adopt the Fellow Servant rule, such an explanation cannot explain
the differences in the rule adopted by jurisdictions exhibiting a generally similar pattern of railroad development.

A plausible explanation for these results is that vastly divergent
legal styles coexisted in the nineteenth century and created the mass of

---

[95] Honner v. Illinois Cent. R.R., 15 Ill. 550, 552 (1854). *Honner* is an extreme
example, a two-page opinion, half of which is taken up by a recitation of the facts. *See
also* Ryan v. Cumberland Valley R.R., 23 Pa. 384 (1854).

> Though this proposition has never been decided upon by this Court, it has
> often been considered elsewhere and decided in the negative . . . . Where
> we find a road is so well beaten, it is easy to follow it, and its beaten
> character is an indication that we may follow it with safety.

*Id.* at 386.

[96] *See, e.g.*, Carle v. Bangor & P. Canal & R.R., 43 Me. 269, 270 (1857);
O'Connell v. Baltimore & O.R.R., 20 Md. 212, 221 (1863). The Maryland restatement is typical in its sweep: "When several persons are employed in the same general
service, and one is injured by the carelessness of another . . . the employer is not responsible. The liability to injury of one from the carelessness of his fellows, is but an
ordinary risk against which the law furnished no protection . . . . " *Id.*

[97] *Cf., e.g.*, C. WARREN, *supra* note 20, at 485-87.

[98] The first great era of railroad expansion was 1840 to 1860. *See supra* note 66.
Almost all American cases of first impression occurred within this time frame.

[99] For variations, however, see Walker v. Bolling, 22 Ala. 294 (1853) (steamboat
accident); Randolph v. Hill, 34 Va. (7 Leigh) 383 (1836) (mining accident).

[100] For details of the narrow version adopted in two states, see *infra* notes 148-
204 and accompanying text. An 1873 compilation of railroad trackage and the number
of incorporated railroad companies reveals few differences in development between
those states which adopted the broad *Farwell* rule and those adopting a qualified version. For example, Illinois, which adopted the broad rule, had 47 companies and 6,620
miles of track; Ohio, which severly qualified the rule, had 42 companies and 4,050
miles of track. Similarly, Maryland, a broad-rule state, had 17 companies and 802
miles; Tennessee, a narrow-rule state, had 18 companies and 1,541 miles. Moreover, if
one compares the incorporation dates of railroad companies in Ohio with those in Massachusetts, one notes that Ohio courts were adopting the narrow rule at the same time
the legislatures in both states were furiously incorporating railroads. AMERICAN RAIL
ROAD MANUAL 460, 410, 280, 378 (E. Vernon ed. 1873).

conflicting jurisprudence that was the Fellow Servant rule. That is, some judges may have been disposed to follow *Priestley* and *Farwell* not because they were instrumentalists attuned to economic developments within their jurisdictions as Horwitz would suggest, but rather because their training and intellectual bias required them to adhere to certain common law myths. This explanation requires recognition that instrumentalist judges like Shaw coexisted with judges like Pratt whose model of proper judicial behavior included adherence to these myths.[101]

According to these myths, the common law grew, slowly[102] or quickly,[103] out of the customs and practices of any particular society. The role of judges, in any particular case, was to "discover" what that rule or custom might be.[104] To any particular legal question, the common law posited but one correct answer, and those judges who rightly "discovered" the correct rule were entitled to respect and adherence.[105] These myths put a premium on judicial harmony and consistency across jurisdictions. A corollary of the concern for harmony was a rev-

[101] Such an explanation also accounts for the peculiar way in which judges framed their dissension to the rule, not by rejecting it, but rather by carving out wide "exceptions" which, in some cases, came close to swallowing the general rule. *See infra* text accompanying notes 120-224. A similar explanation is offered by H.N. Scheiber, who views instrumentalism and traditionalism as coexisting, not only within the same legal system, but within the same judges. *See* Scheiber, *supra* note 50, at 7.

[102] J. WILSON, LECTURES AT THE COLLEGE OF PHILADELPHIA (1791) in 1 WORKS OF JAMES WILSON 335, 353 (R. McCloskey ed. 1967); *see also* 1 J. KENT, COMMENTARIES ON AMERICAN LAW 471 (12th ed. 1884) ("[a] great proportion" of the rules and maxims "grew into use by gradual adoption, and received, from time to time, the sanction of the courts of justice").

[103] J. WILSON, *supra* note 102, at 354; *see also* C. WARREN, *supra* note 20, at 447.

[104] The maxim was stated by Blackstone: "the decisions of courts of justice are the evidence of what is common law." 1 W. BLACKSTONE, COMMENTARIES 88-89, *quoted* in R. CROSS, *supra* note 35, at 23. This myth of judges as "discoverers" of the common law persisted far into the nineteenth century. A late nineteenth century law dictionary, in its definition of "common law," observed, "[t]he decision of a court which establishes or declares a rule of law may be reduced to writing and published in the reports; but this report is not the law; it is but evidence of the law." 1 J. BOUVIER, LAW DICTIONARY 304 (14th ed. 1875). For an assertion that conceptions of common law as "discovered" and "made" by judges have always coexisted, see Simpson, *The Common Law and Legal Theory*, in OXFORD ESSAYS IN JURISPRUDENCE 77, 81 (2d ser. 1973). For the persistence of the "discovery" myth, see F. LAWSON, THE RATIONAL STRENGTH OF ENGLISH LAW 16-17 (1951).

[105] A review of a popular railroad treatise, I. REDFIELD, *supra* note 61, observed that the emerging principles of railroad law were undoubtedly correct and "entitled to confidence" and "respect" owing to the "general uniformity which prevails in the decisions of these cases as they have arisen from time to time in the courts of some thirty different and independent States." *Notices of New Publications*, 20 MONTHLY L. REP. (n.s. No. 10) 533 (1858), *cited in* C. WARREN, *supra* note 20, at 492 n.1. Compare I. REDFIELD, *supra* note 61, at 389, where he notes the divergence between the Scots and English opinions on the Fellow Servant rule and observes, "it is always to be regretted, that any difference of decision should exist, among the tribunals of the different states."

erence for unanimous opinions and a suspicion that divided courts had probably "discovered" wrongly.[106]

Horwitz has argued, however, that the old common law myths of judicial discovery and resultant harmony were discarded by nineteenth-century judges as unwarranted constraints upon their ability to make new law.[107] The Fellow Servant cases, however, including those in which the *Farwell* rule was broadly adopted, demonstrate that these myths did not disappear completely in the nineteenth century.[108]

Shaw's opinion in *Farwell* contained all the characteristics to indicate that its legal solutions were rightly discovered, and thus could be unquestioningly followed by subsequent courts. First, the opinions of certain judges carried more weight than others, and Shaw individually was preeminent.[109] Moreover, as Chief Justice of the highest court of

---

[106] *See, e.g.,* 1 N. DANE, *supra* note 22, at vii (he had relied on only the best authorities, and therefore "not much reliance had been had . . . on divided opinions"); *The Citing of Authorities,* 8 AM. JURIST 111, 117 (1832) ("[c]ases . . . upon which the court has divided, are to be little relied on as authorities, and sparingly cited").

[107] M. HORWITZ, *supra* note 1, at 1-30. Horwitz characterizes the common law myths described here as eighteenth-century conceptions, which were discarded by nineteenth-century judges who had "a new conception of common law as a self-conscious instrument of social policy." These judges believed the common law was not "rules or doctrines to be discovered, not . . . customary norms to be applied through precedent" but rather "a body of prudential regulations framed . . . from the perspective of 'enlarged and liberal views of policy.' " *Id.* at 25-26. Horwitz' periodization, however, has been criticized. *See, e.g.,* Simpson, *supra* note 10. It is a thesis of this Comment that the older conception of the common law survived into the nineteenth century, and that it was the interaction of the old and new styles of judicial reasoning which produced the Fellow Servant rule.

[108] These cases are also evidence of the fervent desire of courts to buttress their opinions by reference to some form of authority. Horwitz has posited that early nineteenth-century judges felt entirely comfortable in reasoning from "first principles," and discarding inappropriate precedent. *See* M. HORWITZ, *supra* note 1, at 24-26. The Fellow Servant cases offer evidence of precisely the opposite desire, not to contradict "well-settled" law. In only two cases was there any hint that a court felt free to contradict established authority. *See infra* text accompanying notes 157-64 & 209-12. Much more typical was the attitude displayed by the editors of the *American Jurist,* one of the earliest legal periodicals, who reviewed new volumes of the Ohio Reports by citing approvingly the maxim "*optima est lex, quae minimum relinquit arbitrio judicis, optimus judex, qui minimum sibi*" ["that law is best which leaves least to the discretion of the judge; that judge is best who leaves least to his own"]. 7 AM JURIST 261 (1832).

[109] Contemporaries self-consciously ordered authorities by referring to the source. Thus, Professor Greenleaf cautioned entering Harvard students in 1838 that one of the prime factors to consider in weighing authorities was "the position of the judges." *Notes of Prof. Greenleaf's Introductory Lecture,* 1 LAW. REP. 217, 219 (1838) (hereinafter cited as *Greenleaf*). This, of course, remains true in the twentieth century. *See* R. POUND, *supra* note 13, at 86; Clark & Trubek, *The Creative Role of the Judge: Restraint and Freedom in the Common Law Tradition,* 71 YALE L.J. 255, 260 (1961). Shaw was on most contemporary, as well as modern, lists of "great judges." *See* C. WARREN, *supra* note 20, at 448; *see also* 2 A. CHROUST, *supra* note 54, at 284. One modern authority noted that Shaw "dominated the common law . . . of that era." Ursin, *supra* note 9, at 259.

Massachusetts, he spoke from a forum which, like the Court of Exchequer, commanded particular respect.[110]

Shaw's method of reasoning, furthermore, reinforced his authority. He had very carefully considered the nature of authoritative legal argument,[111] and his *Farwell* opinion demonstrated his method. He clearly stated the theories of implied contract and assumption of risk upon which the opinion rested, considered the policy consequences of an alternative decision, drew proper analogies to existing law, and stated a broad and clear general rule for exempting a master from liability.[112] This style of analysis carried great persuasive force, if not binding authority. Because the efficient new legal information system put this case quickly into the hands of railroad lawyers,[113] subsequent judges would have been required to go to elaborate lengths to refute it. It was much easier to rule that *Farwell* "appear[ed] to have been thoroughly examined and considered," and therefore one need "entertain no doubt of its correctness."[114]

Finally, as the years passed, and the number of decisions following *Farwell* began to mount, judges disposed to hold masters liable for negligent injuries committed by one servant upon another began to be overwhelmed by the sheer number of precedents against such liability. Railroad lawyers were quick to argue that the Fellow Servant rule was "well settled law."[115] As early as 1853, a Pennsylvania lower court ruled that, even in the absence of a state supreme court decision, a master's liability could "scarcely be regarded as an open question; for

---

[110] *See* 1 N. DANE, *supra* note 22, at vi; R. POUND, *supra* note 13, at 89 (noting that Massachusetts opinions were "followed as a matter of course"); *see also* L. FRIEDMAN, *supra* note 5, at 284.

[111] *See* Shaw, *Profession of the Law in the United States*, 7 AM. JURIST 56, 69 (1832) (address before the Suffolk Bar, May 1827). On Shaw's opinion style, see L. LEVY, *supra* note 15, at 22-26.

[112] Shaw's style in fact paralleled that recently described by Cross as the model of persuasive reasoning in cases of first impression. *See* R. CROSS *supra* note 35, at 194-95.

[113] *See infra* notes 139-47 and accompanying text.

[114] Brown v. Maxwell, 6 Hill 592, 594-95 (N.Y. Sup. Ct. 1844) (Beardsley, J.); *see* Harrison v. Central R.R., 31 N.J.L. 293, 296 (1865) (Shaw's "argument of great force and clearness"); *see also* Honner v. Illinois Cent. R.R., 15 Ill. 550, 551 (1854) ("the whole argument upon the question is embodied in the opinion of Chief Justice Shaw"); I. REDFIELD, *supra* note 61, at 426 n.9 ("very lucid and convincing argument of *Shaw* Ch. J."). Following a well-considered opinion was considered a perfectly respectable course. Thus, one of the factors Professor Greenleaf cited to Harvard students in weighing authority was "the degree of consideration which the point may appear to have received." *Greenleaf*, *supra* note 109, at 22.

[115] *See, e.g.*, Little Miami R.R. v. Stevens, 20 Ohio 415, 422 (1851) (railroad's argument) ("It is well settled that the master is not liable for injuries sustained by one workman or servant by the careless or negligent or unskillful *act of another workman or servant.*") (emphasis in original).

other Courts, of the highest respectability . . . have considered and decided it."[116] By 1861, courts spoke of the rule as one supported by an "unbroken current of judicial opinion,"[117] upon which any tribunal, even in a case of first impression, could rely, thus "greatly relieving us from the responsibility of settling the law."[118] Within twenty-five years of *Priestley*, therefore, even those judges disposed to question the correctness of the rule, clearly had to swim against a strong judicial tide to avoid adopting it. "[W]hatever view we may entertain as to the soundness of the reasons on which the rule was originally established," a Vermont judge observed in 1860, "it is now so firmly supported by authority that it would not be wise to overturn it."[119]

## II. THE "EXCEPTIONS" TO THE FELLOW SERVANT RULE

The broad Fellow Servant doctrine was not universally accepted. While those jurisdictions that followed the rule recognized that the principle was a "comprehensive doctrine, and applies to all agents engaged in the business of the principal,"[120] several jursidictions so severely qualified the rule that its effect in exempting an employer from liability was virtually nullified. The technique by which they did so was to create exceptions which came close to swallowing the rule. These "exceptions," which came in a variety of forms, gave the late nineteenth-century rule its characteristic incoherence which contrasted so sharply with the clarity of Shaw's rule. No account of the development of the rule, therefore, would be complete without an examination of the "exceptions."

Those scholars who explain the rule as a response to economic needs have a ready corollary to explain the growth of the exceptions. The Fellow Servant rule served its purpose of subsidizing the growth of railroads during the great years of railroad expansion prior to 1860. By "the end of the century," Friedman and Ladinsky observe, "the fellow-servant rule had lost much of its reason for existence: it was no longer an efficient cost-allocating doctrine," and therefore the rule was progressively weakened by the development of exceptions.[121]

---

[116] Mitchell v. Pennsylvania R.R., 1 AM. L. REG. 717, 718 (1853).

[117] Moseley v. Chamberlain, 18 Wis. 700, 705 (1861).

[118] O'Connell v. Baltimore & O.R.R., 20 Md. 212, 219 (1863).

[119] Hard v. Vermont & Can. R.R., 32 Vt. 473, 478 (1860).

[120] Little Miami R.R. v. Stevens, 20 Ohio 415, 447 (1851) (Spalding, J., dissenting).

[121] Friedman & Ladinsky, *supra* note 5, at 62, 59. As F. Pollock described the process, "[t]here are some authorities which are followed and developed in the spirit, which become the starting-point of new chapters of the law; there are others that are followed only in the letter, and become *slowly but surely* choked and crippled by excep-